UNITED STATES, Appellee,

v.

**Gerald I. MOBLEY, Technical Sergeant, U.S. Air Force, Appellant.**

No. 63,206.
ACM 26528.

U.S. Court of Military Appeals.

Argued June 12, 1990.

Decided Sept. 27, 1990.

For Appellant: *William J. Holmes, Esq.* (argued); *Major George P. Clark* (on brief); *Colonel Richard F. O'Hair.*

For Appellee: *Captain James C. Sinwell* (argued); *Colonel Robert E. Giovagnoni* (on brief); *Colonel Joe R. Lamport* and *Major Terry M. Petrie.*

## Opinion of the Court

COX, Judge:

Appellant was tried by a general court-martial with members at Bergstrom Air Force Base, Texas, in August and September 1987. Contrary to his pleas, he was found guilty of attempted rape and premeditated murder, in violation of Articles 80 and 118, Uniform Code of Military Justice, 10 USC §§ 880 and 918, respectively. He was sentenced to life imprisonment, total forfeitures, reduction to E–1, and a dishonorable discharge. The convening authority approved the findings and sentence except for the forfeitures, which he reduced to $300.00 per month for 16 months. After modifying the findings and reassessing portions of the sentence, the Court of Military Review affirmed.[1] 28 MJ 1024 (1989).

This Court granted review of the following issues:

### I

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY ADMITTING EVIDENCE TAKEN FROM THE CRIME SCENE WHICH THE DEFENSE WAS NEVER ABLE TO EXAMINE OR REVIEW AS A RESULT OF THE GOVERNMENT'S ARBITRARY AND UNREASONABLE DECISION TO RELEASE THE CAR AND ITS CONTENTS TO [THE VICTIM'S HUSBAND] ON 25 FEBRUARY 1987.

### II

WHETHER THE SPECIFICATION UNDER CHARGE I FAILS TO STATE AN OFFENSE BECAUSE NO CERTAIN OVERT ACT WAS ALLEGED.

### III

WHETHER THE CLOSING ARGUMENT OF TRIAL COUNSEL WAS IMPROPER IN THAT IT INVITED THE MEMBERS' ATTENTION TO THE FACT THAT APPELLANT DID NOT TESTIFY AND COMMENTED ON THE FAILURE OF THE DEFENSE TO CALL VARIOUS WITNESSES.

### IV

WHETHER THE MILITARY JUDGE COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE MEMBERS THAT THEY WERE NOT FREE TO DRAW ANY INFERENCES FROM THE FACT THAT VARIOUS WITNESSES WERE NOT CALLED TO TESTIFY BY THE DEFENSE.

Appellant was convicted of the premeditated murder and attempted rape of Mrs. T, the dependent wife of an Air Force

---

1. Appellant was convicted of attempted rape and premeditated murder while attempting to commit rape. The Court of Military Review "modified [the] finding of premeditated murder" because "the offense of felony murder in ... [this] case ... is embraced within the combined elements of premeditated murder and attempted rape." 28 MJ at 1034. Being "reluctant to dismiss the felony murder language when ... the evidence ... has been reviewed ... and found to be factually and legally sufficient to support a finding of guilty," the court changed the murder specification "by deleting the words, 'and while attempting to perpetrate the offense of rape,'" and stated:

> Having reassessed those portions of the sentence other than confinement, we are convinced that the related punishment elements of dishonorable discharge, forfeiture of all pay and allowances and reduction to airman basic would have been adjudged even if the military judge had dismissed the felony murder language after findings at trial. We conclude that no adjustment of the appellant's sentence is required in light of our action on appeal.
>
> Based on our review of the record ..., we have concluded that the approved sentence is warranted in this case and that it is not unduly severe.
>
> Accordingly, the findings of guilty, as modified, and sentence are affirmed.

28 MJ at 1034–35.

enlisted man. The crime occurred on February 7, 1987, in the parking lot of the Noncommissioned Officers' Open Mess (NCO Club) at Bergstrom AFB. The victim was employed by the club as a cashier and was going home after completing her evening shift. When she did not arrive home within a certain period of time, her husband became worried and left their home to look for her.

At approximately 11:30 p.m. on February 7, 1987, the victim's husband "found her lying" unconscious and bleeding with strangulation marks on her throat, "on the floorboard of the front seat" of her car. The vehicle was still where she had parked it when she arrived at work—"in the last slot of the first row of the NCO Club parking area." She was taken to Brackenridge Hospital in Austin where, despite heroic efforts to save her, she was pronounced dead at 1200 hours on February 9, 1987. The cause of death was "[a]sphyxia due to strangulation (delayed death)."

There were no eyewitnesses to the murder, and appellant did not confess. The Government's case consisted of overwhelming circumstantial and physical evidence linking the homicide to him. The initial link in the chain was not made until some 10 days after the murder, by Sergeant Hesskew, a homicide investigator for the Austin, Texas, Police Department. Upon closer examination of the physical evidence, Sergeant Hesskew found a receipt bearing the name "Gerald Mobley." Sergeant Hesskew instituted a personnel check to determine if Mobley was stationed at Bergstrom AFB and learned that he had been assigned to the Noncommissioned Officers' (NCO) Academy at the time of the murder, but had completed his temporary assignment and returned to his permanent duty station at George Air Force Base, California.

Sergeant Hesskew and Special Agent Brown of the Air Force Office of Special Investigations (OSI) traveled to George AFB, where they found appellant at his residence. After being properly advised of his rights under Article 31, UCMJ, 10 USC § 831, Mobley denied any involvement in the murder. The officers observed several scratch marks on his face and neck, which he claimed he received while playing basketball at the NCO Academy. However, none of the men with whom he had played ball were able to corroborate his assertion. He could not explain how the receipt bearing his name got into the victim's car. One of his academy classmates testified that appellant had met the victim at the NCO Club and that he had expressed a sexual interest in her on more than one occasion, using caustic street language.

A search of appellant's residence with the consent of his wife revealed a leather jacket with blood smeared on the sleeves. The blood was found to be the same type as the victim's. A shoe print taken from the window of the victim's car matched the sole of one of appellant's shoes. A saliva sample taken from appellant was found to be consistent with the semen found on the victim's dress and panties, in that both appellant and the murderer had body fluids identified as "non-secretor." (Blood samples taken from appellant were found to be consistent with blood found spattered in the car.) The victim's blood and that of appellant were not of the same type. A pubic hair sample taken from appellant matched pubic hair found in the car. Finally, a piece of paper with a bloody fingerprint was found in the car. The fingerprint positively matched appellant's.

### Issue I

The first granted issue concerns the evidence found in the victim's car. At the outset of the investigation, the car was impounded by the Austin police department. While the car was impounded, a forensic expert carefully combed the car for evidence, and numerous photographs were made of the vehicle. On February 25, 1987, without any notice to appellant, the police released the automobile to the victim's husband per his request. No pretrial motions were made to produce the vehicle for defense inspection.

At trial, appellant moved *in limine* to exclude Sergeant Hesskew's testimony regarding any forensic evidence taken from the car, particularly the blood spatterings, because the vehicle was released before any defense investigation of it could be

completed.[2] The military judge denied the motion.[3]

The Court of Military Review, concluding that the military judge did not err in his ruling because the vehicle was a "crime scene," stated:

> We know of no rule based upon constitutional, statutory or case law which requires police authorities to preserve a crime scene until appropriate defense

2. The defense motion to suppress evidence from the victim's automobile requested
> the court to suppress certain evidence offered by the prosecution to wit: Any and all evidence taken from the motor vehicle in which the victim, ... was found on or about 7 February 1987 to include: one shoe print, pubic hairs, a receipt with the name "Mobley" on it, semen, photographs of the vehicle and blood stains and other evidence from the vehicle, and any other evidence removed from the vehicle, *on the grounds the accused has been denied his constitutional rights to confrontation and for denial of due process for failure by the Government to preserve evidence for analysis for the defense.*
> (Emphasis added.)

3. The military judge ruled:
> 1. The Ruling and Essential Findings ... on the Defense motion to suppress evidence from the victim's automobile ... are incorporated herein by reference.
> 2. The fact that the defense did not examine the victim's auto before it was returned to ... [her husband] and the fact that each and every spot of blood was not removed from the auto does not provide a basis for excluding Sergeant Hesskew's testimony. As previously found in the referenced Findings, there is no indication whatsoever that apparently favorable evidence material to guilt or relevant to punishment has been withheld, lost, destroyed, overlooked or otherwise not disclosed to the Accused in violation of his constitutionally guaranteed access to evidence. As previously found, while not all the blood stains were removed from the car, representative samples from the areas of the car containing such blood stains were removed. The results of the testing of blood stains are available to the Accused.
> 3. There is no indication whatsoever that the action of the Austin Police Department in returning the auto to its owner after an exhaustive crime scene examination of the interior was motivated by an intention to circumvent disclosure requirements. It was, rather, done in good faith and in accordance with the department's standard practice.
> In pertinent part, "The Ruling and Essential Findings ... on the Defense motion to suppress

representatives have had the opportunity to examine it. Such a rule would be impractical in the extreme, particularly in a case in which the eventual accused at trial is not identified as a suspect until a considerable period of time has passed following discovery of the crime.

28 MJ at 1028.

■ We agree. In so ruling, however, we do not indulge in semantics. Although evidence from victim's automobile" contains the following findings by the military judge:

> *    *    *    *    *    *
>
> 4. The victim's husband ... was the initial suspect but was soon determined not to be a suspect.... Accused became the suspect and was interviewed on 17 February 1987. He was ordered into pretrial confinement on 24 February. On 25 February 1987, Captain David Nix, the lead defense counsel, was detailed to represent the Accused. According to Captain Nix, the car was released to ... [the victim's husband] that same day ... while he was involved in a trial and thus he had no chance to examine it. None of the defense counsels have examined the car, nor apparently have requested to do so, although the Defense Investigator has had access to the car. The car was release d.... to its owner.... There is no evidence that any defense counsel nor any other person ever requested notification before the release of the auto.
> 5. The release of the vehicle ... was done in accordance with the standard procedures of the Austin Police Department. Sgt. Hesskew ... [was] aware of no requirement to advise any other persons of the return of a vehicle under such circumstances. No such requirements, as they might exist in any operating procedures, regulations, or statutes were brought to the attention of the court.
> 6. There is no indication whatsoever that any evidence in the car, either inculpatory or exculpatory, material or otherwise, was lost, overlooked, or not removed, notwithstanding that each and every drop of blood was not removed.... There is no indication that any evidence was either selectively removed or left behind to implicate the Accused as he did not become a suspect until the receipt was unfolded and read, approximately one week after the car had been processed for investigation. There is no indication that the car, a crime scene, was processed and investigated in any manner other than a normal and routine manner. All evidence removed from the car has been preserved and is available to the defense for inspection.
> 7. ... [No] violation of any Constitutional right of the Accused ... occurred as a consequence of the return of the vehicle to its owner.

the vehicle most certainly was a "crime scene" as described by the court, it also contained the type of evidence to which an accused should have reasonable access for examination. Art. 46, UCMJ, 10 USC § 846. There were at least five crucial pieces of evidence obtained from the forensic inspection of the vehicle, including: two varieties of "blood spatters," *see United States v. Mustafa,* 22 MJ 165 (CMA), *cert. denied,* 479 U.S. 953, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986); human hair samples; semen samples; and a shoe-sole print found on the car window. In turn, expert testimony was offered by the Government concerning each of these crucial pieces of evidence. Indeed, the vehicle itself had evidentiary value. For example, the location of prints and blood spatters gave forensic clues as to how the crime was committed.

Notwithstanding the obvious need that anyone involved in the investigation of this homicide have access to this vehicle, no new "rules of law" need be created to mandate that result or to authorize the police to release a vehicle—or any other evidence. Sufficient tools to resolve the case are already available.

Importantly, at the time the vehicle was released, appellant had been arrested and counsel had been "detailed" to represent him. In other words, there were no compelling circumstances which dictated the immediate release of the vehicle to the victim's husband without at least notifying appellant and his representatives and giving them a reasonable chance to inspect the automobile. *Cf. United States v. Garries,* 22 MJ 288 (CMA), *cert. denied,* 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986). However, despite the fairness and equity of permitting the defense to have the opportunity to inspect the vehicle, we acknowledge that appellant enjoys no constitutional right to such consideration. *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), for these reasons:

■ First, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. at 337. This appellant has made no showing of "bad faith."

Second, the defense made no showing that the police suppressed "evidence favorable to an accused" which the Government knew or should have known was "material either to guilt or to punishment." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). Our review of the record suggests no reasonable theory upon which we could conclude that "evidence favorable to an accused" was destroyed because the car was returned to the victim's husband.

Third, as pointed out by the Court of Military Review, several other factors mitigate against excluding the evidence:

> The police sergeant who made certain deductions based upon his examination of blood spatter patterns was available for cross-examination at trial. *United States v. Garries,* 22 MJ [288] at 292 [CMA 1986]. A number of photographs depicting what the officer had observed were introduced as exhibits at trial. *United States v. Kern,* 22 MJ [49,] at 52 [ (CMA 1986) ]. The physical evidence actually removed from the vehicle and the forensic tests conducted thereon were available to defense representatives during the pretrial and trial process. RCM 703(f)(2) [, Manual for Courts–Martial, United States, 1984].

28 MJ at 1028.

In *United States v. Garries,* 22 MJ at 293, we concluded that "[u]nder Article 46, the defense is entitled to equal access to all evidence, whether or not it is apparently exculpatory." Thus, whether this vehicle is characterized as a "crime scene" or as evidence *qua* evidence, Mobley or his representatives should have been afforded a reasonable opportunity to inspect the vehicle before it was released to the victim's husband. To constitute reversible error, however, an accused must suffer some prejudice as a result of the Government's improper conduct. Art. 59(a), UCMJ, 10 USC § 859(a).

We find no prejudice in this record. Furthermore, the vehicle was returned to the victim's husband by Austin city police officials, not by the military police. It is doubtful that those officials would be cognizant of the high standards created by Article 46 of the Uniform Code of Military Justice, and we detect no bad faith on their part in releasing the car as they did. *Arizona v. Youngblood, supra.*

### Issue II

Appellant claims for the first time on appeal that the specification which alleges that the accused "did, ... on or about 7 February 1987, attempt to rape" the victim failed to state an offense because it does not allege an overt act as part of the attempt. At trial, defense counsel did not allege that the specification was defective, but only requested a bill of particulars as to what the Government would prove was the overt act in committing the attempt. Trial counsel merely responded with a list of witnesses and evidence which the Government intended to introduce to prove the attempted rape. The military judge ruled that the information provided to defense counsel adequately informed appellant of what he had to defend against, so he denied appellant's request for a formal bill of particulars.

■ We reject appellant's claim that the specification fails to state an offense. Military case law has long accepted the pleading of attempts under Article 80, UCMJ, 10 USC § 880, without alleging the overt act. *United States v. Marshall,* 18 USCMA 426, 430–31, 40 CMR 138, 142–43 (1969). Nothing in the Manual for Courts–Martial requires—either implicitly or expressly—that the overt act must be pleaded as part of the specification in an attempt. *But cf.* Art. 81 (conspiracy), UCMJ, 10 USC § 881. *Compare* para. 4f *with* para. 5f, Part IV, Manual, *supra.*

■ Although we agree that it may have been better practice to provide appellant with a formal bill of particulars, we are satisfied that he received the functional equivalent. The Discussion following RCM 906(b)(6) states:

> The purposes of a bill of particulars are to inform the accused of the nature of the charge with sufficient precision to enable the accused to prepare for trial, to avoid or minimize the danger of surprise at the time of trial ... when the specification itself is too vague and indefinite for such purposes.
>
> A bill of particulars should not be used to conduct discovery of the Government's theory of a case, to force detailed disclosure of acts underlying a charge, or to restrict the Government's proof at trial.
>
> A bill of particulars cannot be used to repair a specification which is otherwise not legally sufficient.

As previously noted, trial counsel responded to the request by furnishing appellant with a complete list of witnesses and the evidence the Government intended to introduce in the case. This information included proof that the victim's pantyhose and underwear were found pulled down from her waist. In addition, there was evidence of a struggle, and semen and blood consistent with appellant's were found in the car. Moreover, there was a statement by an acquaintance of appellant who had heard him say that he would like to sleep with the victim. Appellant could not have been in doubt as to what overt acts the Government intended to prove. We are satisfied that the judge's failure to order the bill of particulars did not amount to "an error of law ... [that] materially prejudiced the substantial rights of the accused." Art. 59(a), UCMJ, 10 USC § 859(a).

### Issues III & IV

Appellant also claims reversible error because trial counsel's final argument impermissibly commented on appellant's right not to testify or to call witnesses in his behalf, and because the military judge failed to give adequate curative instructions.[4]

**4.** During his instructions of the findings, the military judge advised the members:

■ It is black letter law that a trial counsel may not comment directly, indirectly, or by innuendo, on the fact that an accused did not testify in his defense. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Furthermore, he is not permitted to comment on an accused's failure to produce witnesses in his behalf. *United States v. Swoape*, 21 MJ 414 (CMA 1986). If such comments are made, the record must then be examined for prejudice to determine whether the error was harmless. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ With regard to the assertion that the military judge did not provide a curative instruction advising the members that appellant was not obligated to present witnesses in his behalf, we are convinced that trial counsel's comments were sufficiently defused by the military judge upon defense counsel's immediate objection.[5] Apparently, counsel was satisfied with the military judge's admonition to trial counsel and saw no need for any additional instructions. Absent plain error, that issue was waived. *United States v. Fisher*, 21 MJ 327 (CMA 1986); RCM 920(f).

Trial counsel's comments were described by the military judge as "rhetorical."[6] We find ourselves at a considerable disadvantage to judge this argument because obviously we were not there to observe his demeanor. The cold, written record does not give us a flavor of his tone of voice, his voice inflections, his pauses, or the nuances of his language and its form of presentation. We do know, however, that no timely, contemporaneous objection was made to the presentation.

Nevertheless, the record and the words suggest an image of the accused silently sitting in the courtroom, being bombarded with questions he could not answer, and then listening to answers he could not contest. The practical effect of trial counsel's technique was to do indirectly what he could not do directly; that is, to cross-examine a mute defendant. He would ask the rhetorical question, then imply the answer he hoped to elicit from appellant.

We do not hold that use of the theatrical or oratorical device, the rhetorical question, is *per se* offensive. In many instances, it may well be a very effective method for conveying ideas. If defense counsel had made a contemporaneous objection, we would have expected the military judge to admonish trial counsel to change his strategy.

However, defense counsel represented at trial that he did not object to unfair comments by trial counsel because he was bound not to do so by "AFR 111–1."[7] Ap-

---

*The accused has an absolute right to remain silent. You will not draw any inference adverse to the accused from the fact that he did not testify as a witness in this case.* The fact that the accused has not testified on any other matter must be disregarded by you. *And, in this regard, you heard the trial counsel during the course of his argument of the evidence, ask certain rhetorical questions which appeared to be directed towards the accused, Sergeant Mobley. I think it was obvious to you that these were [a] rhetorical form of questions and a rhetorical form of argument,* but **I do caution you again, that the accused has an absolute right to remain silent, and you will not draw any inference adverse to the accused from the fact that he did not testify as a witness.**
(Emphasis added.)

5. Defense counsel immediately objected, stating that it was "clearly improper argument," although he did not state why it was improper.

The military judge sustained the objection, warning trial counsel that he was "arguing questions asked on voir dire" and that he could only argue from the evidence presented at trial. Defense counsel did not ask for a curative instruction.

6. Excerpts from the record demonstrating the "rhetorical" technique used by trial counsel during closing argument are contained in the appendix.

7. Defense counsel waited until trial counsel concluded his argument, stating:

At this point, the defense requests this court grant a mistrial based upon improper argument. *I did not object during Captain Murphy's argument, because of course, the regulation under which we live, AFR 111–1, provides that you should not object during argument. And if my objection were not sustained, I did not want to be in the position of attempting to*

parently he was referring to Air Force Regulation 111–1, the Military Justice Guide for the Air Force, which was not discussed in the briefs or oral arguments presented by appellate counsel for either the defense or the Government. Our review of the guide has uncovered no such rule of court, local or otherwise, binding a defense counsel to allow a prosecutor to finish before objecting to improper argument. *See also* RCM 919(c). Because the issue has not even been raised on appeal, we will assume that appellant no longer claims that AFR 111–1 had a chilling effect upon defense counsel's ability to object to unfair argument.

If a defense counsel is truly concerned that his client is being treated unfairly at trial, that is *not* the time for him to *worry* that he might "derail" the prosecutor's presentation of the case. Rather, it is his obligation, then and there, to "derail" trial counsel's impermissible argument by objecting. It is the military judge's task to decide if the objection somehow unfairly derails a prosecutor's argument. Although the issue was raised before the Court of Military Review as to whether trial counsel's argument amounted to unfair comment on appellant's failure to testify, that court did not specifically address it.

While we are satisfied that appellant is entitled to no relief with regard to Issues I, II, and IV, we are not so comfortable with Issue III. We believe the court below should have the opportunity to deal with that issue before we consider it.

The decision of the United States Air Force Court of Military Review is set aside.

The record of trial is returned to the Judge Advocate General of the Air Force for submission to that court for specific resolution of the following questions:

1. Did trial counsel's argument constitute unfair comment on, or otherwise unfairly exploit, appellant's failure to testify in his own behalf?

2. Was defense counsel, in fact, precluded from objecting to trial counsel's argument by AFR 111–1, any local rule of practice, Air Force policy, or decision of the Air Force Court of Military Review?

3. If trial counsel's argument was error, did the military judge's instructions cure any harm resulting therefrom?

4. If trial counsel's argument was error, was it harmless beyond a reasonable doubt?

After action on these questions has been taken, the record of trial shall be returned directly to this Court.

Chief Judge EVERETT concurs.

### APPENDIX

*Begin to ask yourselves, Sergeant Mobley, why didn't you go back to the NCO club and cash any more checks? You didn't need any more money? No. The NCO Academy lasted for another full week. Sergeant Mobley, why did you cash but a $15.00 check when you have the evening planned ...? Were you scared to go back to the NCO club because someone might recognize you? Why had you terminated with extreme prejudice, your interest in the NCO*

derail Captain Murphy's argument in any way.... What we had here, were repeated assertions, repeatedly calling attention to the fact that Sergeant Mobley didn't testify by his repeated rhetorical questions to him. His conduct was therefore improper, we therefore now state our objection to trial counsel's closing argument, and move for a mistrial based upon that argument.

(Emphasis added.) The military judge denied the motion, finding, *inter alia,*

that it was evident the pattern of rhetorical questions were just that, rhetorical in nature only, and obviously, under the circumstances,

not asked in a manner which invited attention to the fact that the accused did not testify in his own behalf in this trial.

During rebuttal argument, trial counsel made the following comment:

But, you remember promises you've been made throughout the course of this trial. If you for instance made a promise during the voir dire section of this trial that you were going to hear a myriad or whole host of witnesses come in here and talk to you about a man's exemplary life, his family life, his military career....

club? We don't know what Cindy did again after that 1900 or so check cashing with Technical Sergeant Mobley until about 10:15.

\* \* \* \* \* \*

There's no way to make death pretty. There's just no way to make things pretty when you find a woman who is left swimming in her own gore. None. But, Sergeant Mobley is now off down the road, he's made a commitment, he's decided that he'll take what Cynthia wouldn't give him, he's decided to shut her up permanently, and now he's inside the car. Now, here Sergeant Mobley, is where I can't figure out what you did next. She's on the seat, unconscious, semi-conscious.... *Have you ever been popped right in the face? Have you ever gotten cracked right across the bridge of the nose? Have you ever gotten hit in the temple? Well, Cynthia did on that night. And, Cynthia is stunned, she's bleeding, and gentlemen ... she is starting to live every woman's nightmare, because at some point in that, she regains enough consciousness to realize what's happening. She's living every woman's nightmare, oh, my God, he's trying to rape me.*

\* \* \* \* \* \*

Well now, Sergeant Mobley, by this time, you're well down the road, and you realize that you're not going to be able to do it quite so easily. So, you reach out for the closest weapon, and you draw it across her throat. Maybe that will shut her up. But, it doesn't. She's not just manually strangled, there is a crushing strangulation. *You know something else, Sergeant Mobley, what I can't figure out is, how that shoe print got on the window? Was it there when you were trying to mount her, or was it there when you were getting leverage to crush her neck? I don't know. We'll never know. That's one of those things that's going to be an imponderable*

\* \* \* \* \* \*

*What I can't figure out at this point, Sergeant Mobley, is why you didn't*

*rape her. You had her there. She was unconscious. You got her panties off, you got her panty hose down to mid-thigh. Why didn't you rape her? Was it because the scratches hurt? Was it because she urinated on herself? Was it because the blood on her face and the sound of her gagging on her own blood turned you off? I don't know, is there some other reason you couldn't get the job done? I don't know.* The point of the matter, members of the court, is, we don't have to prove why he didn't get the job done. It can be any of those reasons. *He got in that car intending to and attempting to rape her. And why it wasn't finished, no one knows.*

\* \* \* \* \* \*

So, *what we don't know, another one of those unanswered questions that frankly doesn't need to be answered, is why he didn't rape her, why did he only ejaculate on the floorboard and on her dress?* But, by this time, Sergeant Mobley, things have indeed gone a long, lot further, and you're well down the road, because Cynthia is now struggling against the strap that binds her. It is a desperate struggle, it is one that breaks her fingernails in trying to fend you off, but basically, Sergeant Mobley, by this time, you had her, she was doomed, because by the time you had finished grinding your fist into her throat, Sergeant Mobley, she could never again breathe, she could never again breathe on her own. Now, Sergeant Mobley, let's give you the benefit of the doubt. Let's say for instance, that you really didn't mean to kill her, just to shut her up for a while. *The question that naturally arises is, what in the name of God were you thinking that you would be doing to that woman?*

\* \* \* \* \* \*

*But, Sergeant Mobley, what was going through your mind in those one to two to eight minutes? What could you have been thinking of? Were you thinking of your career? Were you*

*thinking of the lie you'd tell if you ever got caught? Or, did you just not care?*

\* \* \* \* \* \*

Well *Sergeant Mobley, what doesn't make sense in all that is, if she was letting you do what you wanted to do, why did you go back up north and kill her? Why did you go back up her body and put your fingers on that woman's throat, and use your upper body strength to crush the life out of her? If she's consenting to all these things, there's no need to kill her.*

(Emphasis added.) On rebuttal, trial counsel again asked a "rhetorical" question:

If you were attempted [sic] to buy off on the foolishness that the accused was discovered, then ask yourselves, *Sergeant Mobley, why are you sticking around?*

*Why don't you get out of there? Why are you staying around to be clawed? Why are you staying around to get blood on your jacket? Why don't you leave? And, ask yourselves the most important question, why didn't you tell us about it later?*

(Emphasis added.)

SULLIVAN, Judge (concurring in the result):

I concur in the result, simply stating that I find no prejudicial error in this record. If trial counsel's argument was error, my view is that it would be harmless under Article 59(a), Uniform Code of Military Justice, 10 USC § 859(a). Nevertheless, I am not opposed to my Brother Judge Cox' remand to seek the opinion of the Court of Military Review on this point.