# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––

**No. ACM 39043**

––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Brandon J. ALLEN**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 11 October 2017

––––––––––––––

*Military Judge:* Vance H. Spath.

*Approved sentence:* Dishonorable discharge, confinement for 3 years, and reduction to E-1. Sentence adjudged 18 December 2015 by GCM convened at Ramstein Air Base, Germany.

*For Appellant:* Major Annie W. Morgan, USAF.

*For Appellee:* Major G. Matt Osborn, USAF; Major Mary Ellen Payne, USAF; Gerald R. Bruce, Esquire.

Before HARDING, SPERANZA, and HUYGEN, *Appellate Military Judges.*

Senior Judge HARDING delivered the opinion of the Court, in which Judges SPERANZA and HUYGEN joined.

––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

––––––––––––––

HARDING, Senior Judge:

A general court-martial composed of officer members found Appellant guilty, contrary to his pleas, of an attempted lewd act upon a child by sexual contact and an attempted lewd act upon a child by indecent communication,

both in violation of Article 80 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[1] The court-martial sentenced Appellant to a dishonorable discharge, confinement for three years, and reduction to E-1. The convening authority approved the sentence as adjudged.

On appeal, Appellant raises five assignments of error (AOEs): (1) whether the military judge erred in identifying and instructing the court-martial on possible overt acts raised by the evidence for the specification of an attempted lewd act upon a child by sexual contact; (2) whether the evidence is legally and factually sufficient to support the convictions because Appellant did not believe the person he communicated with was a child; (3) whether the findings of guilty as to both specifications are incorrect as a matter of law because Appellant was entrapped; (4) whether the finding of guilty as to attempted lewd act upon a child by sexual contact is incorrect as a matter of law because Appellant abandoned the criminal effort; and (5) whether the convening authority engaged in unlawful command influence when he selected the panel members for Appellant's trial.[2] We find no prejudicial error and affirm.

## I. BACKGROUND

On 18 December 2014, agents with the Air Force Office of Special Investigations (AFOSI) apprehended Appellant on a stairwell landing of an apartment building in base housing on Ramstein Air Base (AB), Germany. Appellant had gone to that particular apartment building intending to engage in sexual activity with a 14-year-old girl he knew as "Tina." Appellant originally met "Tina" by responding to an online personal advertisement. Throughout the course of correspondence spanning three months ultimately leading up to the planned in-person meeting, "Tina" repeatedly and consistently presented herself to Appellant as a 14-year-old military dependent. In the days leading up to the rendezvous, Appellant sent "Tina" multiple explicit messages expressing his desire to engage in sexual activity with her. On the stairwell landing, Appellant stood steps away from the door of the apartment where he believed "Tina" awaited his arrival. Instead of a 14-year-old girl waiting inside, AFOSI

---

[1] Appellant was acquitted of a separate attempted sexual abuse of a child in violation of Article 80, UCMJ.

[2] This issue is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). Three officers who previously served on a panel deciding a case factually similar to Appellant's were excused from this court-martial after court member challenges. Still, Appellant claims an appearance that the convening authority attempted to "stack" the panel by detailing those officers. Appellant also raises a concern that the court members who remained on his panel were somehow tainted by the excused members. We have considered Appellant's arguments but find them without merit. *United States v. Matias*, 25 M.J. 356 (C.M.A. 1987).

agents came out of the apartment and apprehended Appellant. "Tina" was not a 14-year-old girl but a fictitious online persona created by AFOSI Special Agent (SA) TK as part of a larger effort by the Internet Crimes Against Children (ICAC) Task Force in northern Virginia.

The purpose of AFOSI's involvement in the task force was to identify Air Force personnel utilizing social media and online resources to engage in the sexual exploitation of minors. On 22 September 2014, at the request of the AFOSI detachment at Ramstein, Air Base, SA TK posted a personal advertisement on Craigslist localized to the United States military community at or near Ramstein AB, Germany. The post was titled "Dependent Looking for Company – w4m (Landstuhl, Ramstein, Spang, K-Town area)."[3] The post read, in part, "[l]ooking for a military man with a common interest. If interested hit me up on Yahoo . . . lets chat, swap pics, share some stories, and take it from there." The listing included the screenname "daddyluver3."

On 23 September 2014, Appellant responded to SA TK's post by sending a message using Yahoo Messenger to "daddyluver3" and referring to the post on Craigslist. Using the screenname "daddyluver3," SA TK responded to Appellant the next day. The third message that SA TK sent to Appellant read, "im [sic] a dependent 14 yr old if your [sic] interested." Appellant immediately responded "Nope, sorry." Appellant then commented that "daddyluver3" was too young to be looking for guys on Craigslist and asked how much "action" she got after revealing that she was 14. Appellant asked a couple more questions about the people that "daddyluver3" interacted with, acknowledged the risk of "talking [to] and seeing" someone her age, and then wished her "good luck in [her] adventures." Although Appellant seemed to be ending his brief correspondence with 14-year-old "daddyluver3," Appellant continued the conversation and twice asked her where she lived. SA TK asked Appellant if Appellant was interested and why he was persisting if he was not. Appellant replied he was "curious." The message string ended with Appellant asking "daddyluver3" whether she was going to bed or "blowing [him] off." SA TK did not respond to that message. Appellant reinitiated contact with "daddyluver3" a couple days later with the question, "[s]o you blew me off?" SA TK responded, "you wish id blow you off?" Appellant again asked where "daddyluver3" lived and SA TK answered Ramstein AB.

A few weeks later, Appellant reinitiated contact by asking "daddyluver3" for a picture of herself. SA TK did not immediately respond to Appellant's request for a picture. Instead, after a few more weeks had passed, SA TK sent

---

[3] The term "w4m" means "woman seeking man." "Spang" is short for Spangdahlem AB. "K-Town" refers to Kaiserslautern, a town near Ramstein AB.

Appellant a message as "daddyluver3" asking "hey, how ya been[?]" Appellant responded a few days later that he was "good."

In an exchange of messages in mid-November 2014, Appellant made his first specific reference to sexual activities in his online communications with "daddyluver3." Appellant asked why "she" did not have a boyfriend and the conversation then progressed to the topic of "how to treat a lady." Appellant opined that it was "not hard to be good to a lady . . . just be nice, sweet, caring, and good at going down on them and your [sic] set as a guy."[4] Appellant then asked about the meaning of the screenname "daddyluver3." SA TK replied that the name tended to attract older men looking for young girls. The conversation then turned to a discussion about revealing their actual names to each other. Appellant stated his name was "Brannon." SA TK told Appellant that "daddyluver3" was "Tina."

Later in this same exchange of messages, "Tina" asked Appellant if he had ever been with a young girl. Appellant replied that he had and went on to describe in graphic detail how he digitally stimulated the clitoris of this other girl.[5] Appellant subsequently asked "Tina" what sexual activities she had done and "how [she] work[ed] [her] hook-ups." This series of messages ended with Appellant again requesting "Tina" send him a picture.

A few days later, Appellant sent his first message to "Tina" signaling his intent to meet her in person and engage in sexual activity. When asked by Appellant about her weekend, "Tina" replied that it was "not bad [but] didnt do to [sic] much exciting." Appellant answered with the following:

> Well if u would have set [sic] me a message u might have been able to do something exciting.

Appellant then reminded "Tina" that she still had not sent him a picture of her.

Appellant and "Tina" next exchanged messages eight days later. "Tina" informed Appellant that her mother was soon to switch shifts and might work evenings. The implication was that "Tina" would be alone and unsupervised in the evenings after school. In response, Appellant expressed his hope that her mother worked the night shift. Appellant once again asked about getting a picture from "Tina." SA TK then sent Appellant a picture of a female AFOSI agent

---

[4] This language was alleged in the specification of an attempted lewd act with a child by indecent communication.

[5] Appellant's description was alleged in the specification of an attempted lewd act with a child by indecent communication.

whose image had been age-regressed by computer software. Appellant immediately responded, "[w]ow, your [sic] beautiful" and asked whether she had "hooked up with any married guys? Or guys with kids???"

Appellant again raised the possibility of meeting "Tina" in person with the following messages:

> I was on base like 30 mins ago and thought about coming and sneaking u away for a little bit.
>
> I can't wait to see more of u.
>
> And of course I want pics of you . . . you are very cute . . . but I have a feeling soon enough I will see u in person . . . if anything I would say a full body shot . . . you know see u top to bottom.
>
> So if for some reason I was on base later tonight . . . how late is the latest?

"Tina" responded to the last message that it was a school night and her mother was cooking dinner. "Tina" then asked Appellant what he had in mind for them to do if they met. Appellant explained that he "figure[d] [he] wouldn't have much time . . . so a little exploring of a body then some kisses and lastly eyes rolling back by only using two fingers." Appellant continued this banter with "Tina" and commented how he could masturbate after their conversation concluded. In subsequent messaging to "Tina," Appellant continued to press the issue of meeting in person. On 8 December 2014, after informing "Tina" that he was married, he declared: "So it's up to you if you are still interested in talking and seeing where things might go." On 11 December 2014, Appellant inquired of "Tina," "So no chance in maybe seeing you tonight?"

In light of Appellant repeatedly stating his desire and willingness to meet "Tina" in person, SA TK contacted AFOSI agents at Ramstein AB to inform them that Appellant wanted to meet "Tina" in person to engage in sexual activity. By Monday, 15 December 2014, the agents had arranged for the use of an on-base apartment to conduct the meeting, surveillance, and apprehension of Appellant that would take place three days later.

During Appellant's correspondence with "Tina" on 15 December 2014, Appellant again affirmed his desire to meet "Tina" and wrote, "all I wanted was to see u." On prior occasions, "Tina" had deflected Appellant's suggestions to meet. This time, however, "Tina" told Appellant that she could meet him on Thursday after school and suggested they meet at an apartment where she would be house sitting. Appellant expressed apprehension at the possibility of getting caught and sent the following messages to "Tina":

> So if I come to your street Thursday the cops are not going to [be] sitting around the corner are they?

> No offense but it sounds like one of those abc [sic] dateline set ups.
>
> I worry about others seeing me walk into the house.
>
> The house sitting house is not a bad idea. I just want to go drive by it an[d] look at the set-up, see how bad it may look if I go up to it and walk in.
>
> I will take a look on Wed.

About 40 minutes later, Appellant sent "Tina" a message and initiated a sexually explicit conversation discussing his penis size, "Tina" performing oral sex on him, the size of "Tina's" breasts, placing his penis between her breasts, and "Tina's" sexual experience. Appellant then asked "Tina" whether she "ever had a guy go down on [her]." "Tina" answered that she had not and Appellant replied as follows:

> Ok good . . . well u are in for a world of amazing
>
> My wife says I'm like a Greek god down there
>
> U are going to be a lucky girl

Appellant ended the conversation by telling "Tina" that he hoped he would see her on Thursday.

On Wednesday, 17 December 2014, Appellant confirmed with "Tina" that "yes the plan is to meet up tomorrow." On Thursday, 18 December 2014, "Tina" informed Appellant of the building and apartment numbers. At 1645 local time, "Tina" messaged Appellant that she was at the apartment waiting for him. At 1706, Appellant messaged "Tina" that he was on his way. "Tina" replied, "sweet so excited and horny." Appellant replied, "Me too."

Once Appellant arrived at Ramstein AB, AFOSI's surveillance team identified him and alerted the agents at the apartment. When he arrived at the apartment building, the agents observed Appellant walking up and down the street and looking around. Appellant eventually went up the stairs to the apartment and put his ear to the door. Appellant then went back down the stairs and messaged "Tina" to come out on the balcony so he could see that she was there. In response to his request, a female AFOSI agent stepped out onto the balcony. Appellant testified at his trial that he received a message that someone had come outside on the balcony but that he did not see the person because it was dark. He stated that he "could just see the silhouette of somebody between the curtains and the backlight of the apartment." After the female agent went back inside the apartment, Appellant and "Tina" exchanged the following messages:

> Appellant: Are u back inside now?

> Tina: yes, cant take the computer outside lol…are you coming up or what
>
> Appellant: Lol, it was hard to see u with the lights up there…Did you see me?
>
> Tina: yes . . . I think you need to get up here instead of looking like the weird guy on the street lol
>
> Appellant: Ok making the leap
>
> Tina: ok
>
> Appellant: coming up the stairs . . . Here

Appellant re-entered the building, walked up the stairs to a landing between the first and second floor, and waited. After a few minutes, AFOSI agents decided to proceed with the apprehension and found Appellant on the stairwell landing. After his apprehension and release by AFOSI, Appellant, who was a Security Forces investigator, told his supervisor, "it doesn't matter what position you are in, you can still get in trouble."

## II. DISCUSSION

### A. Overt Act Instruction

The specification alleging attempted lewd act upon a child by sexual contact did not specifically allege any particular overt act or acts taken by Appellant. Instead, the specification simply alleged that Appellant attempted to commit a lewd act upon "Tina." Military case law has long accepted the pleading of attempts under Article 80, UCMJ, 10 U.S.C. § 880, without alleging the overt act. *See, e.g., United States v. Garner*, 28 M.J. 634 (A.F.C.M.R. 1989). Nothing in the *Manual for Courts-Martial* requires—either implicitly or expressly— that the overt act must be pleaded as part of the specification. *See United States v. Mobley*, 31 M.J. 273, 278 (C.M.A. 1990). In this case, Appellant does not challenge the specification for failure to state an offense or claim a lack of notice for want of an alleged overt act. Instead, Appellant argues for the first time on appeal that it was error for the military judge to identify and instruct the members on three overt acts raised by the evidence but not alleged in the specification. Appellant avers that "in so instructing the panel, the military judge essentially amended the specification in favor of the [G]overnment and relieved the panel of the need to find a 'substantial step' if it determined the very minimal acts instructed by the judge had occurred." We disagree.

Despite being asked on multiple occasions, the Defense at trial never objected to the military judge's instruction identifying the overt acts raised by the evidence. At an Article 39a, UCMJ, session during the presentation of the Defense's case, the military judge advised counsel of matters he intended to

include in the findings instructions. Referring to draft versions of the instructions he had previously emailed to the counsel, the military judge initially addressed the issue of instructing on overt acts as follows:

> And then the other changes I made in the first two specifications in the first element, we had to put some acts in there. So take a look at that language, because I've added in kind of what I believe sums up the overt acts that would make that an attempt, if the members believe that there's an attempt there. And I believe that to be the biggest changes, so I wanted you to have a place to focus on during the break, so that if we have an opportunity to get to argument this afternoon, we don't have to take a long break before instructions.

At a subsequent Article 39a session, the military judge continued the discussion with counsel on the inclusion of specific overt acts in his instructions on the elements.

> MJ: I took out all of the mistake of fact as to age language by putting in the knowledge of the person's age. That was defense counsel's request to make it more sensible. And then I took out the language about the government not having to prove age since, again, knowledge of age is important because of the attempt nature. So we've already made some changes to the elements. The only significant change now is the acts that may give rise to an attempt in Specifications 1 and 2. So, Trial Counsel, do you believe that properly captures the acts? It's element one on page one, and it's mirrored again when you [get] to Specification 2.
>
> STC [Senior Trial Counsel]: No objection.
>
> MJ: Defense Counsel? I tried to take out the preparatory information, the text leading up to it and focus in on that day.
>
> SDC [Senior Defense Counsel]: No concerns.
>
> MJ: All right. So that's what I will instruct on with regard to the acts.

Shortly thereafter, the military judge asked the Defense for any objections to the proposed findings instructions or requests for additional instructions. Trial defense counsel replied "No, sir." The following morning, just prior to the military judge instructing the members on findings, the Defense again, after being asked, informed the military judge that they had no objections to the

findings instructions. Immediately afterwards, consistent with his prior discussions with counsel, the military judge instructed the members regarding three overt acts he deemed raised by the evidence as follows:

> you must be convinced by legal and competent evidence beyond a reasonable doubt that the accused did certain acts, that is he left work and drove to Ramstein Air Base to a location he believed "Tina" would be at, he texted and communicated with "Tina" while at the location in an attempt to confirm her identity, and approached the door identified as the location where "Tina" would be.

The military judge further instructed the members they must also be convinced beyond a reasonable doubt that (1) the acts were done with the intent to commit the offense of lewd act with a child; (2) the acts amounted to more than mere preparation, that is, they were a substantial step and direct movement toward the commission of the intended offense; and (3) the acts apparently would have resulted in the actual commission of the offense of lewd acts upon a child except for a circumstance unknown to the accused which prevented completion of the offense. The military judge then defined both "preparation" and "substantial step."

> Preparation consists of devising or arranging the means or measures necessary for the commission of the attempted offense. To find the accused guilty of this offense, you must find beyond a reasonable doubt that the accused went beyond preparatory steps, and his acts amounted to a substantial step and a direct movement toward the commission of the intended offense. A substantial step is one that is strongly corroborative of the accused's criminal intent and is indicative of his resolve to commit the offense.

Just prior to closing the court for the members' deliberations on findings, the military judge again inquired whether the Defense had any objections to the findings instructions and, once again, the Defense did not object.

Because there was no objection to the instruction at trial, we review for plain error. *United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013). Under a plain error analysis, "Appellant has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of [Appellant]." *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011). "While military judges have some discretion in tailoring panel instructions, a military judge has a duty to provide appropriate legal guidelines to assist the jury in its deliberations." *United States v. Killion*, 75 M.J. 209, 213 (C.A.A.F. 2016) (internal quotations and citations omitted).

"Failure to provide correct and complete instructions to the panel before deliberations begin may amount to a denial of due process." *United States v. Wolford*, 62 M.J. 418, 419 (C.A.A.F. 2006). R.C.M. 920(e) expressly requires that instruction on findings include, inter alia, "[a] description of the elements," R.C.M. 920(e)(1), and "[s]uch other explanations, descriptions, or directions as may be necessary and which are properly requested by a party or which the military judge determines, sua sponte, should be given." R.C.M. 920(e)(7).

Contrary to Appellant's assertion that the military judge "essentially amended the specification in favor of the [G]overnment," the military judge expressly followed the guidance for instructing on the elements of an attempt as contained in the *Military Judges' Benchbook*.[6] Members are to be instructed that they must be convinced beyond a reasonable doubt that an accused did a certain act or acts as either alleged or raised by the evidence. As there were no overt acts alleged in the specification, the military judge properly exercised his discretion to identify sua sponte overt acts raised by the evidence. This not only was in step with the *Benchbook* guidance but also fulfilled the military judge's responsibility to provide an adequate description of that element for the members. The only question is whether the evidence actually raised the overt acts the military judge chose to include in the instruction.

In addition to evidence presented by the Government in its case in chief, Appellant himself provided testimony that established that he drove to Ramstein Air Base to a location he believed "Tina" would be present; that he texted "Tina" while at that location to confirm she was there; and that he approached the door of the apartment where "Tina" was. It was not error for the military judge to identify these acts as possible overt acts related to the alleged attempt offense. Once instructed, the members were to determine whether any of the acts were proven beyond a reasonable doubt and whether "they were a substantial step and a direct movement toward the commission of the intended offense," as the military judge further instructed. Given the law and the facts of this case, we find no error, let alone one that is plain or obvious, in the military judge's instructions on overt acts.

## B. Legal and Factual Sufficiency

Appellant's second, third, and fourth AOEs articulate separate bases to allege that the evidence is legally or factually insufficient or both as to his two convictions for attempted lewd acts upon a child. Specifically, Appellant claims that he did not believe that "Tina" was a child and therefore the evidence for both specifications is legally and factually insufficient. Appellant makes two

---

[6] Department of the Army Pamphlet 27-9, *Military Judges' Benchbook*, ¶ 3-4-1 (10 Sep. 2014).

additional legal sufficiency claims styled by Appellant as "incorrect as a matter of law." First, Appellant asserts that the evidence for both specifications is legally insufficient because he was entrapped by the Government. Second, Appellant argues that the evidence is legally insufficient for the attempted lewd act upon a child by sexual contact because he voluntarily abandoned his criminal effort. We disagree.

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993). The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987); *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term "beyond a reasonable doubt" does not mean that the evidence must be "free from conflict." *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325; *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

There are four elements of attempt: (1) that the accused did a certain overt act; (2) that the act was done with the specific intent to commit a certain offense under the code; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense. *Manual for Courts-Martial, United States* (2012 ed.) (*MCM*), pt. IV, ¶ 4.b. Here the underlying offense is sexual abuse of a child, which is also described as lewd act upon a child. "Lewd act" as charged in this case, means any sexual contact with a child or intentionally communicating indecent language to a child by any means, including via any communication technology, with an intent to abuse, humiliate, or degrade any person, or to arouse or gratify the sexual desires of any person. *MCM*, pt. IV, ¶ 45b.a.(h)(5).

### 1. Appellant's Belief Whether "Tina" Was a Child

Appellant makes the same claim on appeal that he unsuccessfully made at trial, namely that he "did not believe he was conversing with someone who was only 14 years of age." Appellant further claims his unrefuted testimony that he believed "Tina" was an adult interested in fantasy roleplay and his observation of the adult female AFOSI agent on the balcony prior to his going up the stairs of the apartment building render his convictions factually and legally insufficient. We disagree.

The ultimate determination of what Appellant believed about "Tina's" age was a matter for the fact-finder to resolve. Appellant's claimed belief that "Tina" was an adult was refuted by other evidence in the case. Beginning with the very first communication with Appellant and consistent to the last, "Tina" maintained that she was 14 years old. She injected topics, such as her school activities and interactions with her mother as indicators of her age. Although Appellant characterizes his communications with "Tina" as fantasy roleplaying, the evidence supports the contention that Appellant responded to Tina's messages consistent with a belief that she was in fact 14 years old and an intent to gratify his sexual desires. Further, Appellant's reliance on his observation of an adult on the balcony as evidence of his purported belief that "Tina" was an adult is repudiated by his own testimony at trial. When asked at trial if the person stepped out on the balcony, Appellant responded, "They said they came outside. I didn't see them . . . it was too dark to be able to make anybody actually was really out there. You could just see the silhouette of somebody between the curtains and the backlight of the apartment." Considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found beyond a reasonable doubt that Appellant had the specific intent to engage in sexual contact with a 14-year-old girl along with the other essential elements for an attempt. After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt that Appellant believed that "Tina" was a 14-year-old girl and that Appellant is guilty of the two attempt offenses.

### 2. Entrapment

Appellant claims the findings of guilty as to both specifications are incorrect as a matter of law because he was entrapped by the government. We disagree. A successful claim of entrapment requires evidence that the criminal design or suggestion to commit the offense originated with the government, not the accused, and the accused was not predisposed to commit the offense. *See* Rule for Courts-Martial (R.C.M.) 916(g); *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002); *United States v. Howell,* 36 M.J. 354, 359 (C.M.A. 1993).

Entrapment requires an improper inducement by government agents to commit the crime. *Howell,* 36 M.J. at 359. Inducement means more than merely providing the appellant the means or opportunity to commit a crime. *Id.* at 358. Instead, the government's conduct must "create[ ] a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense . . . . Inducement may take different forms, including pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship." *Id.* at 359–60 (citations, emphasis, and internal quotation marks omitted).

The government may use undercover agents and informants to ferret out crime and afford opportunities or facilities for criminals to act upon. *Jacobson v. United States,* 503 U.S. 540, 548 (1992); *see also Howell*, 36 M.J. at 358; *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992). "Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441 (1932); *see also United States v. Russell*, 411 U.S. 423, 435–36 (1973). For example, law enforcement may pretend to be someone other than a government agent. *See Howell*, 36 M.J. at 358.

The question of predisposition relates to a law-abiding citizen. *Whittle*, 34 M.J. at 208. "A law-abiding person is one who resists the temptations, which abound in our society today, to commit crimes." *United States v. Lubitz*, 40 M.J. 165, 167 (C.M.A. 1994) (citing *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991)). One who accepts an invitation to commit a crime without being offered an extraordinary inducement shows a predisposition to commit the crime. *Whittle*, 34 M.J. at 208.

In litigating the entrapment defense, the accused has the initial burden of showing that the criminal design or suggestion originated with the government. *Hall*, 56 M.J. at 436. Once that hurdle is met, the burden shifts to the prosecution to prove beyond a reasonable doubt that the criminal design did not originate with the government or that the accused was predisposed to commit the offense. *Id.*; *United States v. Wheeler*, 76 M.J. 564, 574 (A.F. Ct. Crim. App. 2017).

While SA TK posted the original advertisement on Craigslist, the ad was not directed at Appellant, and Appellant was the one who chose to respond. In "Tina's" third message, she indicated she was 14 years old. While Appellant acknowledged the risk of corresponding with a 14-year-old, he still pursued the relationship. While SA TK provided opportunities for Appellant to commit the offenses, SA TK did not initiate any of the discussions quoted in the specification for an attempted lewd act upon a child by indecent communication. Appellant made the first explicit reference to sexual activity when he messaged "just be nice, sweet, caring, and good at going down on them." Further, Appellant,

without any prodding from SA TK, repeatedly raised and pursued the possibility of meeting "Tina" in person for the purpose of engaging in sexual activity. SA TK never pressured Appellant to commit either attempt offense. Thus, there was no inducement by a government agent. Appellant made the decisions to respond to the ad, continue communications with a purported 14-year-old girl, send sexually explicit messages, and pursue a meeting with "Tina" with the intent to engage in sexual activities with her.

Even though SA TK falsely represented facts such as his gender and age, there was no overreaching by the government. SA TK did not pressure or coerce Appellant to commit the attempt offenses. Thus, we find Appellant has failed to satisfy his initial burden of showing that the criminal design originated with the government. However, we also analyze the case as if the burden shifted to the Prosecution.

As described above, we first find beyond a reasonable doubt that there was no improper government inducement. We further find beyond a reasonable doubt that Appellant was predisposed to commit the offense. Again, Appellant first suggested meeting in person and initiated the communications regarding sexual activity. The Government need not present evidence that Appellant committed or attempted to commit a similar offense on a previous occasion. A person's readiness and willingness to commit the offense is evidence of predisposition. *Whittle*, 34 M.J. at 208.

Here, the government's conduct did not create a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense. Appellant, by his actions, demonstrated his predisposition to commit the underlying offenses. Considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found beyond a reasonable doubt that Appellant was not entrapped.

### 3. Voluntary Abandonment

Appellant's final argument with respect to legal sufficiency is that he voluntarily abandoned his plan to have sexual contact with a child and thus is not guilty of this attempt offense. We disagree.

Voluntary abandonment is an affirmative defense to a completed attempt offense. *United States v. Schoof*, 37 M.J. 96, 103 (C.M.A. 1993); *United States v. Byrd,* 24 M.J. 286, 290 (C.M.A. 1987). "It is a defense to an attempt offense that the person voluntarily and completely abandoned the intended crime, solely because of the person's own sense that it was wrong, prior to the completion of the crime." *MCM*, pt. IV, ¶ 4.c.(4). The defense is raised when the accused abandons his effort to commit a crime "under circumstances manifesting a complete and voluntary renunciation of his criminal purpose." *Schoof,* 37 M.J. at 104 (citation omitted). Voluntary abandonment does not exist "if the

abandonment results, in whole *or in part*, from other reasons, for example, *the person feared detection or apprehension*, decided to await a better opportunity for success, was unable to complete the crime, or encountered unanticipated difficulties or unexpected resistance." *MCM*, pt. IV, ¶ 4.c.(4) (emphasis added).

The existence of abandonment as a defense "necessarily implies that a punishable attempt precedes it." *United States v. Collier,* 36 M.J. 501, 510 (A.F.C.M.R. 1992). "[A] person who has performed an act which is beyond the stage of preparation and within the zone of attempt may nevertheless avoid liability for the attempt by voluntarily abandoning the criminal effort." *Byrd,* 24 M.J. at 290 (citation omitted). Given that it is an affirmative defense, the burden rests on the Government, once it is put into controversy, to rebut the defense beyond a reasonable doubt. R.C.M. 916(b)(1).

Appellant never abandoned his plan to meet and engage in sexual activity with "Tina." Instead, Appellant sent "Tina" a message that he was "making the leap." AFOSI agents watched as he stood on the stair landing outside the apartment door. As Appellant made no move to leave, the agents came out of the apartment and apprehended Appellant. Considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found beyond a reasonable doubt that Appellant did not voluntarily abandon his attempted lewd act upon a child by sexual contact.

### III. CONCLUSION

The findings of guilt and the sentence are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court