*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
CRISFIELD, HITESMAN, and GASTON
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Dashawn Q. NICHOL**
Aviation Ordnanceman Third Class (E-4), U.S. Navy
Appellant

**No. 201800286**

Argued: 3 October 2019–Decided: 28 May 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Robert P. Monahan (arraignment)
Michael D. Libretto (motions)
Derek Butler (motions and trial)

Sentence adjudged 10 April 2018 by a general court-martial convened at Naval Station Norfolk, Virginia, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to pay grade E-1, confinement for 25 years, total forfeiture of pay and allowances, and a dishonorable discharge.

For Appellant:
*Mr. Zachary Spilman, Esq.* (argued)
*Lieutenant Clifton E. Morgan III, JAGC, USN* (on brief)

For Appellee:
*Lieutenant Kimberly Rios, JAGC, USN* (argued)
*Captain Brian L. Farrell, USMC* (on brief)

Senior Judge HITESMAN delivered the opinion of the Court, in which Chief Judge CRISFIELD and Senior Judge GASTON joined.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

HITESMAN, Senior Judge:

Appellant was convicted, contrary to his pleas, of two specifications of rape and two specifications of sexual assault, in violation of Article 120, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 920 (2012).[1]

Appellant raises seven assignments of error [AOE][2]:

  I.    Whether prosecutorial misconduct prejudiced Appellant.

  II.   Whether a sentence rehearing is required because of improper prosecution sentencing argument and other asserted errors.

  III.  Whether it was error for the military judge to admit certain prior consistent statements.

  IV.   Whether the military judge improperly admitted a victim's out-of-court statement as an excited utterance.

  V.    Whether it was error for the military judge to admit evidence of the alleged victims' demeanor.

  VI.   Whether the evidence is factually sufficient to support Appellant's convictions.

---

[1] The military judge dismissed one specification of sexual assault conditioned upon successful appellate review of the corresponding specification of rape against the same victim for the same sexual act.

[2] Appellant also raised, in a footnote, an additional AOE asserting the record is incomplete. We reviewed this AOE and find it to be without merit. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.R. 1987).

VII.   Whether the military judge's findings instructions for the offense of sexual assault by causing bodily harm (where the sexual act itself is the bodily harm) failed to separate wrongful conduct from otherwise innocent conduct.[3]

We find no prejudicial error with the findings and affirm them.[4] However, we find that errors in the Government's sentencing argument prejudiced Appellant. Accordingly, we set aside the sentence and remand for a rehearing.

## I. BACKGROUND

Appellant's convictions arise out of three incidents involving three different women over a two-year period.

### A. Aviation Ordnanceman Airman [AOAN] DB

Appellant and AOAN DB worked together in the same work center onboard Naval Station Norfolk, Virginia. On 23 May 2015, they and Appellant's roommate went to a nearby amusement park and then returned to Appellant's apartment later in the evening. The three played video games until AOAN DB became tired and wanted to go to sleep for the night. Appellant's roommate offered her the couch, but Appellant offered to let her sleep in his bed. AOAN DB chose to sleep in Appellant's bed. She changed her clothes and got into Appellant's bed leaving the light on and the door open. Appellant entered the room twice and offered AOAN DB wine. She declined.

After AOAN DB had fallen asleep, Appellant entered the room again, ripped the covers off of her, grabbed her phone from her hand as she was trying to call for help, pulled her shorts off, pried her legs open, and had sexual intercourse with her.

---

[3] Appellant acknowledges that in *United States v. McDonald,* our superior court recently rejected the same argument that he now presents. 78 M.J. 376, 380-81 (C.A.A.F. 2019). This AOE has no merit.

[4] This Court previously issued an opinion, *United States v. Nichol*, No. 201800286, 2020 CCA LEXIS 100 (N-M. Ct Crim. App. Mar 31, 2020) (op. withdrawn). This Court granted Appellant's Motion for Reconsideration and withdrew the prior opinion.

AOAN DB dressed and found Appellant's roommate playing video games. She demanded that he take her home. Sometime later that summer, AOAN DB told her boyfriend that Appellant had raped her.

## B. Aviation Machinist's Mate Third Class [AD3] BB

AD3 BB also worked with Appellant and she was friends with AOAN DB. On 12 June 2015, AD3 BB went to a party at another Sailor's home where she saw AOAN DB and Appellant. AD3 BB and AOAN DB later played beer pong, a drinking game, for hours. After playing beer pong, AD3 BB hung out on the patio with Appellant and another Sailor. Appellant told AD3 BB that he had something to tell her and led her away to a secluded area behind a stairwell and away from others at the party. Appellant then kissed AD3 BB, who pushed him away and said, "No." Appellant began to grab and hold AD3 BB, put his hand down her pants, and inserted his fingers into her vagina several times. Appellant then turned AD3 BB around so that she was in front of him and bent her over. He tried to take her shorts off, but AD3 BB resisted and was able to escape when Appellant released her after they heard voices nearby.

AD3 BB texted her friend, Aviation Structural Mechanic Third Class [AM3] NC, that Appellant "tried to take advantage of her."[5] She then stayed with AM3 NC the rest of the night. On the following Monday, AD3 BB told another good friend, AO3 LR, what Appellant had done to her.

## C. Ms. DR

Ms. DR, a 38-year-old civilian mother of four, met Appellant in a chemistry class at a local community college. They became friends and occasionally socialized outside of class. Ms. DR referred to Appellant as her FFB (fake f[***]k buddy). On 27 June 2017, Appellant and Ms. DR made plans to meet at his apartment and drink. Appellant showed Ms. DR a video of his friends under the influence of Xanax. He then showed Ms. DR a Xanax pill that he had taken from his friends. Ms. DR poured herself a vodka and pineapple juice drink and went to the bathroom. She later felt "weird," and after a second trip to the bathroom, Appellant pushed her into his bedroom. Ms. DR resisted and was able to get out of Appellant's bedroom and return to the living room. The next thing Ms. DR remembers is waking up the next morning nude on Appellant's living room couch. Ms. DR left Appellant's apartment and went to work. She told a friend at work that she thought Appellant had

---

[5] Record at 1003.

"Bill Cosby'd" her, meaning that he drugged her and took advantage of her. She later sent Appellant a text message accusing him of the same thing, in the exact same words. At first, Appellant denied anything happened, but then admitted they had sex. They continued to talk about the night for the next few days even though Ms. DR reported the sexual assault once Appellant admitted they had sex. On the morning of 29 June 2017, Ms. DR surreptitiously recorded a phone call with Appellant and discussed the events of the evening, including how much she drank, the Xanax video, the Xanax pill, and what led up to the two of them having sex. Appellant denied drugging Ms. DR and was adamant that she should get a drug test and that he would pay for it.

Additional facts necessary to resolve the AOEs raised are addressed below.

## II. DISCUSSION

### A. Prosecutorial Misconduct on Findings

Appellant raises several allegations of prosecutorial misconduct that he contends resulted in prejudicial error with respect to the findings. He avers that trial counsel committed prosecutorial misconduct throughout the findings phase of the trial: opening statement, examination of witnesses, and closing argument.[6]

Prosecutorial misconduct occurs when a prosecutor "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). In general, it is "defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger,* 295 U.S. at 88.). The conduct of the "trial counsel must be viewed within the context of the entire court-martial . . . not [just] on words in isolation." *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)).

---

[6] Under a separate AOE, *infra*, Appellant also contends that trial counsel presented improper argument during the sentencing phase of the trial.

Improper argument is a type of prosecutorial misconduct, and we review both de novo. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citation omitted)). When properly objected to at trial, we review for prejudicial error. *Id.* (citing *Fletcher*, 62 M.J. at 179). "[When] no objection is made, we hold the appellant has forfeited his right to appeal and we review for plain error." *Id.* Plain error "requires that: (1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights." *United States v. Pabelona*, 76 M.J. 9, 11 (C.A.A.F. 2017) (citation and internal quotation marks omitted). "[W]hen trial counsel's comments, taken as a whole, [are] so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone," an appellant's conviction must be reversed. *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014).

*1. Preserved errors*

Appellant argues that both trial counsel made improper arguments that prejudiced his right to a fair trial. Appellant notes that civilian defense counsel [CDC] raised several objections during closing arguments including arguing facts not in evidence, arguing for an improper spillover of evidence, disparaging the defense counsel, commenting on Appellant's right to not testify / remain silent,[7] and offering obviously objectionable hearsay statements in front of the members.

a. Arguing facts not in evidence

While arguing that Appellant raped AOAN DB, the assistant trial counsel stated, "Nobody wants to be the victim of a sexual assault at their first command. It provides no benefit to them. In fact that harms a career."[8] CDC did not object to these comments, but did object during rebuttal argument when the trial counsel stated, "[AOAN DB] questioned herself after, she blamed herself. That's a normal feeling for a victim of rape."[9] The military judge sustained the objection, stating, "There are no facts in evidence to support that. Counsel may make arguments for reasonable inferences on

---

[7] We examined this claim but found it wholly unsupported by the record.

[8] Record [R.] at 1481.

[9] R. at 1550.

facts [that] are in evidence, but I don't recall anything to support that."[10] We consider the prejudicial effect of both issues together below.

### b. Arguing for an improper spillover

Assistant trial counsel first commented on Appellant's false statements to Ms. DR, stating that Appellant would "say or do anything to keep a third victim from coming forward to report him."[11] CDC objected on the grounds that the assistant trial counsel was arguing for an improper spillover. The military judge sustained the objection and issued a spillover instruction.

Assistant trial counsel later asked the members to compare the veracity of Appellant's out-of-court statements to the testimony of each victim. CDC objected twice on grounds of the improper spillover effect of that comparison. The military judge overruled the objection each time, but in response to each objection, the military judge also issued an appropriate curative instruction reminding the members that each offense must stand on its own, the burden of proof is on the Government, only the members determine the credibility of any evidence, and the argument of counsel is not evidence.

Trial counsel, during rebuttal argument, then argued that each victim was inconsistent in some part of her story to show that while people may forget things or remember things differently, that does not mean they are lying about everything or even about important facts. CDC objected, contending this argument invoked an improper spillover that would prejudice a legitimate defense to one of the other charges. The military judge overruled the objection but still issued a spillover instruction to the members.

It has long been recognized that "where criminal intent involved in two offenses is similar (although the offenses themselves are unrelated) and, significantly where the proof of one would not be admissible to prove the other, there is a serious danger that overwhelming proof of one will 'spill over' and prejudice a legitimate defense to another." *United States v. Haye*, 29 M.J. 213, 215 (C.M.A. 1989). We do not have such a case before us. Notwithstanding Appellant's argument, discussing the fact that each victim's testimony was inconsistent in some way regarding the facts of her own sexual assault is not proof of the accused's criminal intent, as discussed in *Haye*. It is merely an attempt to minimize and explain the inconsistencies in each victim's testimony as compared to the facts and prior statements regarding each

---

[10] *Id.*

[11] R. at 1497.

victim's own assault—not the assaults of the other two victims. Moreover, pointing out minor inconsistencies in each victim's testimony does not advance any fact in issue, but only reflects on each victim's credibility. Except for the first instance, where the military judge properly sustained the objection, we find no additional error, and we find that the military judge did not abuse his discretion in overruling the second and third Defense objections.

### c. Disparaging the defense counsel

It is "improper for a trial counsel to attempt to win favor with the members by maligning defense counsel." *Fletcher*, 62 M.J. at 181 (citations omitted). Doing so detracts from the dignity of the proceedings and has the potential to turn the court-martial into "a popularity contest" with the members deciding the case, not on the facts and the law, but "based on which lawyer they like better." *Id.* In addition to "detract[ing] from the dignity of judicial proceedings[,]" personal attacks can "cause the [trier of fact] to believe that the defense's characterization of the evidence should not be trusted, and, therefore, that a finding of not guilty would be in conflict with the facts of the case." *United States v. Xiong*, 262 F.3d 672, 675 (7th Cir. 2001). This violates the core legal standard of criminal proceedings, that the Government always bears the burden of proof to produce evidence on every element and persuade the members of guilt beyond a reasonable doubt. *See United States v. Czekala*, 42 M.J. 168, 170 (C.A.A.F. 1995); Rules for Courts-Martial [R.C.M.] 920(e)(5)(D).

Trial counsel disparaged the Defense by arguing that they introduced certain evidence "to embarrass, humiliate, and slut-shame"[12] Ms. DR. The military judge sustained CDC's objection to that statement and issued an instruction to the members "that evidence has been introduced and it should be considered by you only on the issue whether Ms. [DR] was truthful in her statement [to] the sexual assault nurse examiner about her recent sexual activity."[13] We address the prejudicial effect of the misconduct below.

### d. Additional preserved error

Appellant contends that both trial counsel offered obvious hearsay statements in front of members without an evidentiary basis. During the Government's case-in-chief, assistant trial counsel called AD3 BB to testify and used her statement to Naval Criminal Investigative Service [NCIS] special agents

---

[12] R. at 1545.

[13] Id.

to refresh her recollection. On cross-examination, CDC impeached her also using her previous statement to NCIS. On re-direct examination, assistant trial counsel offered the statement into evidence in front of the members. CDC objected and assistant trial counsel withdrew the offer.

Trial counsel also called AO3 LR to testify about what AD3 BB told her shortly after Appellant assaulted her. AO3 LR testified on direct and cross-examination about her statement to NCIS. After one of the members asked to see the statement, trial counsel offered it into evidence. CDC objected and assistant trial counsel conceded, in an Article 39(a), UCMJ, hearing that the Government had no legal basis to admit the statement.

Appellant now argues that the attempts to admit obvious hearsay statements constitute misconduct because trial counsel had no basis for admitting the statements. We agree the type of unacceptable gamesmanship displayed by the assistant trial counsel and his subordinate, trial counsel, in offering obviously objectionable statements in front of members constitutes misconduct, demands the attention of their leadership, and should never be accepted in our courtrooms. However, even in light of the trial counsels' motives, the military judge made the correct ruling after hearing both parties in an Article 39(a), UCMJ session and issued an immediate instruction to the members that the statement was not admitted into evidence and that it "cannot be held against either side in this case."[14] We find the military judge's instruction sufficient thus far in the trial to remedy any adverse consequence of the trial counsels' plainly inappropriate action.

Our superior court has cautioned supervisors of litigators against condoning improper prosecutor conduct, reminding us that prosecutors must seek justice and not just convictions.[15] We add to this caution that military judges must be quick to act sua sponte to stop such improper conduct—irrespective

---

[14] R. at 1068.

[15] As Judge Sparks reminds supervisors of litigators in *United States v. Voorhees*,

> the consistent flow of improper argument appeals to our Court suggests that those in supervisory positions overseeing junior judge advocates are, whether intentionally or not, condoning this type of conduct. As superior officers, these individuals should remind their subordinate judge advocates of the importance of the prosecutor's role within the military justice system and should counsel them to "seek justice, not merely to convict."

79 M.J. 5, 15 (C.A.A.F. 2019) (quoting *Fletcher*, 62 M.J. at 182).

of whether it appears intentional or inadvertent—as it occurs in their courtrooms. In this case, offering two clearly inadmissible statements in front of members was blatantly inappropriate. The military judge could have delivered a much stronger message to trial counsel and his supervisor - the assistant trial counsel - in this case. He could also have seen to it that higher-level supervisory counsel were notified of what was transpiring during the court-martial, required their presence in the courtroom as observers before allowing the trial to continue, and noted the taking of these or other prophylactic measures on the record. We are firmly of the view that, far from being questioned by this Court, such strong exercise of judicial discretion in this particular area is paramount to a military judge's duty to "exercise reasonable control over the proceedings to promote the purposes of [the Rules for Courts-Martial] and [the *Manual for Courts-Martial*]." R.C.M. 801(a)(3).

### 2. Other error

Appellant failed to object to other statements of trial counsel that he now challenges. He asserts that trial counsel invoked an improper spillover during opening statements, argued additional facts not in evidence, presumed Appellant to be guilty, shifted the burden to Appellant to prove his innocence, called Appellant a liar, and commented on the fact that Appellant did not testify. By not objecting at trial, Appellant forfeited these issues and we review them for plain error. After carefully reviewing the record and the pleadings of the parties, we find additional error only in trial counsel arguing facts not in evidence.

While arguing in closing that Appellant raped AOAN DB, the assistant trial counsel stated, "Nobody wants to be the victim of a sexual assault at their first command. It provides no benefit to them. In fact that harms a career."[16] The Defense did not object. However, as noted above, CDC did object during rebuttal argument when trial counsel argued a similar theme with respect to AOAN DB. Upon that objection, the military judge sustained it and agreed, in front of the members, that those facts were not in evidence. He further instructed the members that arguments of counsel are not evidence.

"[T]rial counsel [are] also prohibited from injecting into argument irrelevant matters, such as personal opinions and facts not in evidence." *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007) (citations omitted). *See also Davis v. Zant*, 36 F.3d 1538, 1548 n.15 (11th Cir. 1994) (discussing that

---

[16] R. at 1481.

despite argument not being evidence, counsel are still not allowed to argue "material misstatements of fact."). "[A] court-martial must reach a decision based only on the facts in evidence." *Fletcher*, 62 M.J. at 183 (citation omitted). However, counsel are permitted to comment during argument "on contemporary history or matters of common knowledge . . . [of] which [people] in general have a common fund of experience and knowledge, through data notoriously accepted by all." *Id.* (citations and internal quotation marks omitted).

Even though CDC did not object, we agree that assistant trial counsel's comments were improper because we find no evidence in the record to support the assertions and they go well beyond general "matters of common knowledge." *Id.* Accordingly, we will test for prejudice below.

### 3. Prejudice to Appellant

Finding some error, we now turn to evaluate the potential prejudice by examining the severity of the misconduct, the measures adopted to cure the misconduct, and the weight of the evidence supporting the conviction. *Fletcher*, 62 M.J. at 184. The third *Fletcher* factor alone may be dispositive of the issue. *United States v. Sewell*, 76 M.J. 14, 18-19 (C.A.A.F. 2017). "[P]rosecutorial misconduct by a trial counsel will require reversal when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Id.*

We first look at the severity of the misconduct. "[T]he argument by a trial counsel must be viewed within the context of the entire court-martial. The focus of our inquiry should not be on words in isolation, but on the argument as 'viewed in context.'" *Baer*, 53 M.J. at 238 (C.A.A.F. 2000) (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)). Appellant's trial lasted for seven days, and Appellant alleges ten improper arguments and remarks during approximately two hours of combined opening statement, closing argument, and rebuttal. Taken as a whole and in the context of a lengthy, contentious, and emotionally-charged trial, both trial counsel's improper arguments and comments amounted to only a very small fraction of the trial. Offering clearly objectionable hearsay statements before the members, asserting facts not in evidence, and disparaging the Defense's motives and intentions were the most egregious of the trial counsels' infractions, but each act occurred only once or twice, and none supported a central theme of the Government's case. Although trial counsel's comments were improper, we find that the misconduct, considered in the proper context of the trial as a whole, was not unduly severe.

Next, we look at whether there were any curative measures taken. Upon objection by CDC, the military judge issued a curative instruction in all but two of the objections he sustained. After trial counsel offered obviously objectionable statements into evidence in front of the members, the military judge sustained the Defense objection and issued an immediate instruction to the members that the statement was not admitted into evidence and that it "cannot be held against either side in this case."[17] He also issued curative instructions on two occasions where he overruled the Defense objections to the government invoking a spillover. The military judge still issued spillover curative instructions to ensure that the members understood the limitations on the use of the evidence. The military judge also sustained the Defense objection to trial counsel's "slut shaming" comment and issued an immediate curative instruction that the members should consider the evidence introduced by the Defense only as it related to the relevant witness's credibility.[18] As discussed above, although the military judge did not sua sponte undertake any specific curative measures for the instance of trial counsel's arguing facts not in evidence during closing argument to which the Defense did not object, he appropriately sustained the Defense objection on the same grounds during rebuttal argument and correctly instructed the members that while counsel may argue for reasonable inferences, those inferences must be supported by facts in evidence.[19] Additionally, the military judge issued standard instructions to the members, to include "arguments by counsel are not evidence" and to "base the determination of the issues in the case on the evidence as you remember it and apply the law as I instruct you."[20] "We presume, absent contrary indications, that the panel followed the military judge's instructions with regard to the improper testimony and trial counsel's arguments." *United States v. Short*, 77 M.J. 148, 151 (C.A.A.F. 2018) (citation and internal quotation marks omitted). Trial counsels' conduct was certainly inappropriate but it occurred in a few different instances spread throughout the trial. At this point in the trial, the misconduct was not so egregious that the military judge's curative instructions were inadequate. Finding no evidence to the contrary, we find that the members followed the military judge's instructions.

---

[17] R. at 1068.

[18] R. at 1545.

[19] R. at 1550.

[20] R. at 1446.

Finally, we consider the strength of the evidence against Appellant. In *United States v. Sewell*, the Court of Appeals for the Armed Forces [CAAF] found that the weight of the evidence supporting the appellant's conviction alone was strong enough to establish a lack of prejudice. 76 M.J. at 18. Here, the Government produced substantial evidence of Appellant's guilt. The evidence against Appellant included testimony by each of the three victims; a recorded telephone call between Appellant and Ms. DR a few days after she was raped; DNA analysis that confirmed Appellant had ejaculated in Ms. DR's vagina even though he told her that he used a condom; testimony that Appellant had no prior sexual or romantic interaction with any of the three victims; testimony that each victim reported Appellant's misconduct to a friend; and Appellant's own statements exhibiting consciousness of guilt.

Considering the isolated and brief nature, albeit blatant, of the trial counsel's improper conduct spread throughout the seven day trial, coupled with the strength of the Government's case relating to each of the victims, we find that Appellant was not prejudiced. Although we have some concerns regarding the fairness and integrity of this trial, considering the entire record we are convinced that the members convicted Appellant based on the overwhelming evidence of his guilt.

## B. Prior Consistent Statements

Prior consistent statements are admissible if the declarant testifies, is subject to cross-examination, and the statements are offered to (1) rebut an express or implied charge that the declarant recently fabricated it, or acted from a recent improper influence, or motive in so testifying; or (2) to rehabilitate the declarant's credibility as a witness when attacked on another ground. Mil. R. Evid. 801(d)(1)(B).

We review a military judge's admission or exclusion of evidence for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citations and internal quotation marks omitted).

Relevant evidence, as defined by Military Rule of Evidence [Mil. R. Evid.] 401, may be excluded by the military judge "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403. So long as the military judge conducts a proper balancing test, the ruling will not be overturned unless there is a clear abuse of discretion. *United States v.*

*Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citation and internal quotation marks omitted). We owe less deference to the military judge who fails to articulate a Mil. R. Evid. 403 balancing analysis on the record, and no deference to a ruling in which the Mil. R. Evid. 403 analysis is altogether absent. *Id.*

### 1. AOAN DB's prior consistent statement is admissible

At trial, the Government offered, over Defense objection, the testimony of AOAN DB's boyfriend, who stated AOAN DB told him that "Nichol had raped her."[21] Appellant argues that AOAN DB's prior consistent statement was improperly admitted because it (1) did not precede her motive to fabricate under Mil. R. Evid. 801(d)(1)(B)(i), and (2) did not rehabilitate her credibility under Mil. R. Evid. 801(d)(1)(B)(ii). Appellant contends AOAN DB knew her boyfriend would be upset if he knew she was having sex with Appellant. Appellant avers that this was the only motive to lie that CDC argued and this motive preceded AOAN DB's statement to her boyfriend that Appellant raped her; therefore, the statement does not qualify for admission as a prior consistent statement.

Here, however, the facts are not so simple, and where "multiple motives to fabricate or multiple improper influences are asserted, the statement need not precede all such motives or inferences." *United States v. Allison*, 49 M.J. 54, 57 (C.A.A.F. 1998). After AOAN DB testified, CDC cross-examined her and impeached her by omission for not mentioning to NCIS that Appellant's ejaculate ran down her leg after he raped her, whether she and Appellant had ever slept in the same bed before, the number of times she had visited Appellant's house, and the fact that her boyfriend would have been upset if he found out she had consensual sex with Appellant. In addition, CDC also suggested that AOAN DB's memory was influenced by trial counsel when he asked:

> Okay, now who helped you make these memories . . . so it was just yourself. So, in other words, at no time did the trial counsel say to you, "wait a minute, you know, you told NCIS that you were thinking about going to his house?"[22]

---

[21] R. at 848-49.

[22] R. at 754-55.

After closely examining the record, notwithstanding Appellant's argument, we find that CDC clearly implied that AOAN DB's testimony was coached or influenced by trial counsel.

The military judge admitted AOAN DB's statement to her boyfriend because there was

> testimony back and forth about recent changes in memory and recent developments in changes in her testimony after talking [to] trial counsel, her [Victims' Legal Counsel] or [Appellant's roommate] or anyone else who may have given her—who may have had an impact in fabricating testimony or given her recently improper influence in her testimony. Additionally, it would be offered to rehabilitate the declarant's credibility as she did testify as a concern about flirtatious behavior or mistake of fact as to consent or that sort of thing. So, to the extent that credibility was attacked on those grounds . . . it would be proper under 801 (d)(1)(1)(b)(2) [sic] as well.[23]

While we agree with the military judge that AOAN DB's prior consistent statement could be used for some purposes under Mil. R. Evid. 801(d)(1)(B)(ii), we find this rationale unnecessary because the prior consistent statement is clearly admissible under Mil. R. Evid. 801(d)(1)(B)(i) to rebut the implied charge that AOAN DB's testimony was recently influenced by trial counsel.

Having determined that the prior consistent statement was admissible under Mil. R. Evid. 801(d)(1)(B)(i), we next analyze whether it was properly admitted under Mil. R. Evid. 403. The military judge conducted a Mil. R. Evid. 403 balancing test with respect to AOAN DB's statement to her boyfriend, but he did not articulate his reasoning on the record.

AOAN DB's statement to her boyfriend was very brief and consisted of just a few words. It occurred in the summer of 2015, days to possibly months after she was raped. AOAN DB's boyfriend does not remember much detail other than her demeanor as she reported that Appellant raped her. In light of the Defense implication that AOAN DB had been influenced by trial counsel, the statement was significant to show that AOAN DB's report to her boyfriend had been made closer in time to the rape, and prior to her interaction with trial counsel. We find the probative weight of the statement made by AOAN DB to her boyfriend was not substantially outweighed by the danger

---

[23] R. at 844.

of unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence. Mil. R. Evid. 403.

AOAN DB's prior consistent statement was admissible under Mil. R. Evid. 801(d)(1)(B)(i) and the military judge did not abuse his discretion when he admitted it into evidence.

*2. Appellant waived any claim of error regarding Ms. DR's prior consistent statement*

Appellant argues that it was plain error for the military judge to admit Ms. DR's out-of-court statement to her friend at work as a prior consistent statement. We find that he waived any claim of error relating to admission of the statement.

While we review a military judge's admission or exclusion of evidence for an abuse of discretion, *Solomon*, 72 M.J. at 179 (citation omitted), when an appellant does not raise an objection to the admission of evidence during trial, this court first determines whether the appellant waived or forfeited that objection. *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018) (citation omitted).

On direct examination, *without* defense objection, Ms. DR testified that she told a friend at work, "I waken [sic] up on his sofa with no clothes on and that I thought—the term that I used I thought he had Bill Cosby'd me. That's what I said to her."[24] Prior to issuing his findings instructions to the members, the military judge summarized an R.C.M. 802 conference on the record, stating that the parties discussed the prior consistent statements of each victim and the proposed instructions. The military judge stated that he had initially "omitted prior consistent statements from [AOAN DB] and [Ms. DR] and I believe, Defense, you concurred that—or did not object to that being added to that section?"[25] CDC responded, "Yes, sir."[26] The military judge then explained that the three victims all made prior consistent statements and he

---

[24] R. at 1103.

[25] R. at 1434.

[26] *Id.*

would instruct the members regarding the statements.[27] He then asked CDC if he had any objection, and CDC responded, "No, sir."[28]

While CDC's mere failure to object during the trial counsel's direct examination of Ms. DR may constitute forfeiture that we would ordinarily review for plain error, in this case any issue regarding the admission and use of the prior statement was waived during discussion of prior consistent statements and the findings instructions regarding those prior consistent statements. At that point, CDC had another opportunity to lodge an objection to the prior consistent statement evidence and to seek a limiting instruction on how the evidence could be used by the members. At the very least, that would have forced trial counsel to articulate the basis for admission and required the military judge to put his reasoning on the record. Instead, CDC waived the issue for a third time. We find that CDC unequivocally waived the issue when he affirmed the military judge's R.C.M. 802 summary that CDC either had no objection to, or concurred with, including reference to Ms. DR's prior consistent statement in the findings instructions. The waiver was again confirmed when CDC stated he had no objection to the prior consistent statement instruction regarding all three victims. *See United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (quoting *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009)) (finding that affirmatively declining to object to the military judge's instructions waives the claim).[29]

## C. Excited Utterance

AD3 BB testified that, immediately after escaping from Appellant's grasp, she walked down the hall and texted AM3 NC that Appellant had "tried to take advantage of" her. AM3 NC testified that he observed AD3 BB "very shortly after" receiving her text. He noticed that she was "shaken up," "scared," and "different."[30]

---

[27] R. at 1435.

[28] *Id.*

[29] Even if we did not find a clear waiver of the underlying evidentiary issue by virtue of the CDC's repeated, verbalized acceptance of the prior consistent statement and proposed findings instructions, we would nevertheless find that Appellant suffered no prejudice under a plain error analysis, as Ms. DR made the very same comment during her post-rape text message exchanges with Appellant, which were also admitted into evidence without Defense objection. *See* Pros. Ex. 6 at 8; R. at 1080-81.

[30] R. at 1001.

At trial, over Defense objection, AM3 NC testified that AD3 BB told him Appellant "tried to take advantage of her and she said no."[31] Here, as at trial, Appellant asserts this was not an excited utterance and that the military judge erroneously admitted it as such.

We review the military judge's decision to admit statements "under the excited utterance exception to the rule against hearsay" for an abuse of discretion. *United States v. Feltham*, 58 M.J. 470, 474 (C.A.A.F. 2003). The abuse of discretion standard requires "more than a mere difference of opinion"—the decision must be "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009) (citations and internal quotation marks omitted).

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement that it caused" is admissible as an exception to the general prohibition on hearsay. Mil. R. Evid. 803(2). "The implicit premise [of the exception] is that a person who reacts 'to a startling event or condition' while 'under the stress of excitement caused' thereby will speak truthfully because of a lack of opportunity to fabricate." *United States v. Jones*, 30 M.J. 127, 129 (C.M.A. 1990). The CAAF has adopted a three-part test to determine whether a hearsay statement qualifies as an excited utterance: "(1) the statement relates to a startling event, (2) the declarant makes the statement while under the stress of excitement caused by the startling event, and (3) the statement is spontaneous, excited or impulsive rather than the product of reflection and deliberation." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003) (citations and internal quotation marks omitted).

Appellant does not assert that a sexual assault would not constitute a startling event. Nor does he dispute that AD3 BB's statement made to AM3 NC that Appellant "tried to take advantage of" her related to the sexual assault. Instead, Appellant argues that AD3 BB was not under the stress of a startling event when she sent the text to AM3 NC. Appellant places particular emphasis on the time lag between the time the text message was sent and received and the time when AM3 NC actually observed AD3 BB's demeanor. He asserts that because AM3 NC did not see AD3 BB for some indeterminate amount of time after the utterance was made, AM3 NC's testimony fails to establish a proper foundation for the excited utterance exception. We disagree.

---

[31] *Id.*

Although "a lapse of time between the event and the utterance creates a strong presumption against admissibility," *Jones*, 30 M.J. at 128, "the lapse of any particular period of time, is not the focus of the excited utterance rule. The critical determination is whether the declarant was under the stress or excitement caused by the startling event." *Feltham*, 58 M.J. at 475 (citation omitted). "A lapse of time between a startling event and an utterance, while a factor in determining whether the declarant was under the stress of excitement caused by the event, is not dispositive of that issue." *Donaldson*, 58 M.J. at 483 (citations omitted). Likewise, we conclude that in the instance of an excited utterance conveyed via text message, a lapse of time between the transmission of the message and the receiver's observation of the declarant's demeanor, is a factor to be considered but also is not dispositive of the issue of whether the declarant was excited.

Based on the record before us, we are convinced that there was sufficient evidence for the military judge to conclude that AD3 BB was still under the stress of excitement caused by the sexual assault when she texted AM3 NC and was "very shortly" thereafter observed by AM3 NC. Her text message statement to AM3 NC—that Appellant "tried to take advantage of"[32] her— was not the result of reflection or fabrication, and her demeanor as observed by AM3 NC soon afterward was not affected by any intervening incident. The military judge applied the proper legal test to evaluate the statement, and, after hearing and evaluating the evidence, properly determined that the facts satisfied the test. In so doing, he did not abuse his discretion in admitting AD3 BB's statement to AM3 NC as an excited utterance.

### D. Demeanor Evidence

Appellant next asserts that the military judge erred when he admitted evidence, over Defense objection, of the victims' demeanor when they reported to friends what Appellant had done to them. Appellant argues that the demeanor evidence was not relevant and was unfairly prejudicial.

We review a military judge's evidentiary rulings for an abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010). The military judge may exclude relevant evidence after conducting a Mil. R. Evid. 403 balancing test. In this instance, there is no indication that the military judge considered Mil. R. Evid. 403 before ruling on the motion so we examine the record for ourselves. *See Manns*, 54 M.J. at 166.

---

[32] R. at 1003.

"Lay opinion testimony is only admissible if (1) the opinion is rationally based on the witness's perception; and (2) the opinion is helpful either to an understanding of the testimony of the witness on the stand or to the determination of a fact in issue." *United States v. Lopez*, 76 M.J. 151, 156 (C.A.A.F. 2017) (citations and internal quotation marks omitted). However, "[s]o long as the opinion [of a lay witness] is based upon personal observation and is relevant, [the witness] may testify about another's emotional state. No unique ability or specialized training is required to form such opinions." *United States v. Patrick*, 78 M.J. 687, 712 (N-M. Ct. Crim. App. 2018) (quoting *United States v. Roberson*, 65 M.J. 43, 47 (C.A.A.F. 2007).

AOAN DB's boyfriend and two friends of AD3 BB provided the lay opinion testimony at issue. During an Article 39(a), UCMJ, hearing, the Defense raised a motion in limine to prevent trial counsel from eliciting the emotional state of the victims as they were reporting what Appellant had done to them. The military judge denied the motion, finding the demeanor testimony admissible and relevant as to credibility.

AOAN DB's boyfriend testified that in the summer of 2015, days to possibly months after her rape, she told him that Appellant had raped her. He described her as "broken down" and said she "could barely talk" when she told him Appellant had raped her. As discussed above, the statement itself was admitted into evidence as a prior consistent statement.

AM3 NC testified that AD3 BB texted him that Appellant "tried to take advantage of her. She said no but he was too strong."[33] When he next saw her after a "very short amount" of time, she looked "shaken up scared."[34] As discussed above, the statement itself was admitted into evidence as an excited utterance. Another friend of AD3 BB's also testified that AD3 BB told her about the assault on the Monday following the party and when she described what Appellant had done to her, she "seemed shocked." This statement was made without objection from CDC.

The demeanor evidence of each of the lay witnesses is relevant, probative, and admissible because it was based on their personal observation of either AOAN DB or AD3 BB; it would be helpful to the members in understanding the witness's testimony; it would be helpful to the members in assessing the credibility of AOAN DB and D3 BB; and it tended to corroborate that a traumatic event had occurred to AOAN DB and AD3 BB. While the demeanor

---

[33] *Id.*

[34] R. at 1001.

evidence was not favorable to Appellant, we find no support in the record for the contention that the probative weight of the evidence was outweighed by any of the Mil. R. Evid. 403 factors. Accordingly, we find that the military judge did not abuse his discretion when he admitted lay opinion evidence of the victims' demeanor.

### E. Legal and Factual Sufficiency

Appellant asserts the evidence is legally and factually insufficient to support his convictions with respect to each of the three victims. Article 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). To determine legal sufficiency, we ask whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015). In evaluating factual sufficiency, we determine whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325. In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict." *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

To support Appellant's conviction for rape with respect to AOAN DB, the Government needed to prove beyond a reasonable doubt that: (1) Appellant committed a sexual act upon AOAN DB, to wit: penetration of her vulva with his penis; and (2) that he did so by unlawful force, to wit: prying her closed legs open with his hands.

AOAN DB testified before the members, describing in detail Appellant's conduct on the night of 23 May 2015. Appellant twice entered the room where she was sleeping and offered AOAN DB wine, which she declined both times. Appellant then re-entered the room, pulled the blankets off of AOAN DB and got on top of her. She testified that Appellant said, "I know you want this"[35]

---

[35] R. at 707.

two times despite AOAN DB telling him to stop. She attempted to use her phone to call for help, but Appellant grabbed it out of her hand and threw it to the side of the bed. AOAN DB testified that she continued to resist and curled up in the fetal position but Appellant pried her legs open and inserted his penis into her vagina. She attempted to call for Appellant's roommate but he was playing video games in a different room. When Appellant had finished, he tossed her to the side and she got up and left. She found Appellant's roommate and demanded that he take her home. Later that summer, AOAN DB told her boyfriend that Appellant raped her. Her boyfriend described her as "broken down"[36] and stated that she "could barely talk"[37] while describing the rape. Appellant's roommate also confirmed that he had headphones on while playing video games and did not hear anything related to the rape. He also confirmed that he took AOAN DB home later that night after she found him playing video games.

To support a conviction for sexually assaulting AD3 BB, the Government was required to prove beyond a reasonable doubt that: (1) Appellant committed a sexual act upon AD3 BB; and (2) that he did so by causing bodily harm, to wit: penetration of her vulva with his finger without her consent.

AD3 BB testified before the members describing Appellant's assault on her at the party on 12 June 2015. She testified that she had rebuffed Appellant's advances at work and that they had no prior romantic or sexual encounters. At the party, Appellant asked to speak to AD3 BB alone and led her to a secluded spot behind a stairwell. Appellant then attempted to kiss AD3 BB, put his hand in her pants, and tried to remove them. Appellant was able to penetrate AD3 BB's vagina with his fingers several times. AD3 BB said, "No" repeatedly and attempted to resist, finally getting free when Appellant stopped because he heard voices nearby. AD3 BB immediately texted her friend, AM3 NC who was also at the party, that Appellant had "tried to take advantage of her . . . she said no but he was too strong."[38] AM3 NC testified that within a short period of time after receiving the text, he saw AD3 BB and noticed that she was "different . . . almost shaken up, scared."[39] Appellant's roommate also testified that Appellant appeared "frantic" and "shook" at the party and told him: "Bro, you are not going to believe this. [AD3 BB]

---

[36] R. at 848.

[37] R. at 849.

[38] R. at 1003.

[39] R. at 1001.

grabbed my hand and put it down her pants and said you are going to catch a SAPR case."[40] The Government called AD3 BB's good friend to testify that AD3 BB reported the details of her assault to her on the Monday following the party.

To support Appellant's conviction for rape with respect to Ms. DR, the Government needed to prove beyond a reasonable doubt that: (1) Appellant committed a sexual act upon Ms. DR by causing penetration of her vulva with his penis; (2) that he did so by administering to her, without her knowledge or permission, a drug; and (3) he thereby substantially impaired her ability to appraise and control her conduct.

Ms. DR testified before the members, explaining the circumstances surrounding the evening on which Appellant raped her. She described how Appellant showed her a video of his friends who were high on Xanax and then showed her a Xanax pill. Ms. DR explained that after she went to the bathroom, she returned to her drink and then began to feel "weird," like she was "floating [and] . . . the room was spinning."[41] She testified that she never experienced these symptoms with alcohol before. Ms. DR testified that she exchanged text messages with Appellant the following day and he denied that anything happened. Later that day, Ms. DR and Appellant talked on a video call where Appellant initially denied having sex but later admitted that they had sex but that he used a condom. Ms. DR then reported the sexual assault the Virginia Beach Police Department. A telephone call between Appellant and Ms. DR was recorded within days after the rape and was played for the members. During this recording, Ms. DR confronted Appellant about the video of his friends intoxicated on Xanax and showing her the Xanax pill. Appellant explained what happened and what led to the two of them having sex. He stated that he used a condom but DNA evidence later showed that was a lie, demonstrating his consciousness of guilt. Finally, a toxicologist testified to explain why Xanax might not have been detectable in Ms. DR's urine by the time she was tested.

Ms. DR did have significant loss of memory on the night she was raped. As Appellant argues, there is no direct evidence of Xanax in her system and no Xanax was found in the possession of Appellant. While these facts do make this issue a much closer call, the members heard those same arguments and weighed the same circumstantial evidence and drew the inference that

---

[40] R. at 1034.

[41] R. at 1095.

Ms. DR was drugged by Appellant before he had sex with her. In addition, during the recorded telephone call, Appellant does not deny or dispute that he showed Ms. DR the video of his friends high on Xanax and showed her the Xanax pill. This corroborates Ms. DR's testimony that Appellant had Xanax; he had the opportunity to put it in her drink; she later felt "weird" like she was "floating" and everything was "spinning;" and the next thing she remembered was waking up in the morning, disoriented and naked on the couch. Moreover, after Ms. DR confronts Appellant regarding the Xanax video and she accuses him of drugging her, Appellant offers to pay for a drug test and suggests she be tested for several drugs, but does not suggest Xanax.

After carefully reviewing the record of trial and considering the evidence in the light most favorable to the prosecution, we are persuaded that a reasonable fact-finder could have found all the essential elements required to convict Appellant beyond a reasonable doubt of rape of AOAN DB, sexual assault of AD3 BB, and rape of Ms. DR. Furthermore, after weighing the evidence in the record of trial and recognizing that we did not personally see the witnesses' testimony, we too are convinced beyond a reasonable doubt of Appellant's guilt.

## F. Sentencing Errors

Finally, Appellant contends that a sentence rehearing is warranted due to trial counsel's improper sentencing argument and other errors, including that the sentence was inappropriately severe, that he suffered illegal pretrial punishment, and that the military judge erred by not allowing Appellant to rebut a victim impact statement with a video showing the victim's drug use. We find reversible error in the Government's sentencing argument and do not address the remaining AOEs.

Appellant claims that trial counsel's sentencing argument was so riddled with prosecutorial misconduct that a sentence rehearing must be ordered. He also specifically contends that trial counsel improperly commented on Appellant's exercise of his constitutionally protected rights when he argued that Appellant forced the victims to be in court. When a proper objection to a comment is made at trial, the issue is preserved and we review for prejudicial error. *Fletcher*, 62 M.J. at 179 (citing Art. 59, UCMJ).

Trial counsel's sentencing argument was brief and lasted less than 18 minutes and is transcribed in less than 10 pages. During the argument, CDC objected 10 times and was only overruled twice. While the serious nature of the charges of which Appellant stands convicted are both repetitive and egregious, trial counsel's sentencing argument, wherein he repeatedly makes objectionable comments to the members, is far from that contemplated by professional standards. As the Supreme Court stated long ago:

> The [prosecutor] is the representative not of an ordinary party
> to a controversy, but of a sovereignty whose obligation to gov-
> ern impartially is as compelling as its obligation to govern at
> all; and whose interest, therefore, in a criminal prosecution is
> not that it shall win a case, but that justice shall be done. As
> such, he is in a peculiar and very definite sense the servant of
> the law, the twofold aim of which is that guilt shall not escape
> or innocence suffer. He may prosecute with earnestness and
> vigor—indeed, he should do so. But, while he may strike hard
> blows, he is not at liberty to strike foul ones. It is as much his
> duty to refrain from improper methods calculated to produce a
> wrongful conviction as it is to use every legitimate means to
> bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935), *quoted in United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005).

These principles demand that prosecutors steer clear of any improper arguments that may produce a wrongful sentence. *See Baer*, 53 M.J. at 237. In this regard, while "[i]t is appropriate for trial counsel—who is charged with being a zealous advocate for the Government—to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence," he or she must remain ever mindful of not "crossing the line and wandering dangerously into the realm of impermissible argument." *Id.* at 237-38 (citations omitted).

Improper sentencing arguments are analyzed for prejudice under the *Fletcher* factors—the severity of the misconduct, the measures adopted to cure the misconduct, and the weight of the evidence supporting the sentence—to determine "whether trial counsel's comments, taken as whole, were so damaging that we cannot be confident that [Appellant] was sentenced on the basis of the evidence alone." *United States v. Halpin,* 71 M.J. 477, 480 (C.A.A.F. 2013) (citation and internal quotation marks omitted).[42] In this analysis, "the argument by a trial counsel must be viewed within the context

---

[42] While the third *Fletcher* factor typically examines the weight of the evidence supporting the *conviction*, in the sentencing context this factor addresses the weight of the evidence supporting the "adjudged and approved sentence." *Halpin*, 71 M.J. at 480. Thus, in this context, the third factor would generally look at not only the evidence adduced on the merits, but also the evidence submitted by the parties during the presentencing proceedings as well as any information submitted to the sentencing authority via victim impact statements.

of the entire court-martial. The focus of the inquiry should not be on words in isolation, but on the argument as viewed in context." *Baer*, 53 M.J. at 238 (citations and internal quotation marks omitted). In other words, "we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." *Fletcher,* 62 M.J. at 184. "[I]t is not the number of legal norms violated but the impact of those violations on the trial which determines the appropriate remedy for prosecutorial misconduct." *Meek,* 44 M.J. at 6.

As the analysis is focused ultimately on effect rather than cause, the prohibition against impermissible sentencing arguments, as with other forms of prosecutorial misconduct, applies whether the misconduct is inadvertent or intentional. We must first determine whether the prosecutorial misconduct at issue "actually impacted on a substantial right of an accused (*i.e.*, resulted in prejudice)," and if so, then "consider[] the trial record as a whole to determine whether such a right's violation was harmless under all the facts of a particular case." *Id.* at 5 (citations omitted). In addition, if an error is constitutional in nature, "rather than the probability that the outcome would have been different, courts must be confident that there was *no reasonable possibility* that the error *might have contributed* to the [outcome]." *United States v. Tovarchavez*, 78 M.J. 458, 462 n.5 (C.A.A.F. 2019) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)) (emphasis in original).

As to the first *Fletcher* factor, the errors at issue here—whether inadvertent or intentional—were both severe and pervasive. Our superior court has provided several indicators to consider in this regard:

> (1) the raw numbers—the instances of misconduct as compared to the overall length of the argument, (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations, and (5) whether the trial counsel abided by any rulings from the military judge.

*Fletcher*, 62 M.J. at 184. Here, the 18-minute sentencing argument drew ten objections, all but two of which were sustained. The improper comments were peppered throughout the argument and included, among other things, improperly advising the members of the maximum sentences that could be imposed for each of the offenses Appellant was convicted of; arguing the only reason Appellant had not committed additional sexual offenses leading up to

his trial was because he had been placed in pretrial confinement;[43] arguing facts not in evidence (some of which the Government had already drawn sustained objections for during its findings arguments); and arguing the victims had not participated in the court-martial by any choice of their own, but were forced to do so by Appellant. After a seven-day trial, the members deliberated for just over an hour before adjudging a sentence that included 25 years' confinement.

Second, the measures adopted to cure the misconduct, while not unreasonable when analyzed in isolation, were ultimately insufficient to cure the cumulative effect of the Government's misconduct as a whole. Generally, "[a] curative instruction is the preferred remedy for correcting error when the court members have heard inadmissible evidence, as long as the instruction is adequate to avoid prejudice to the accused." *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (dealing with a trial counsel devoting much of his opening statement to discussing inadmissible evidence) (citation omitted). Absent evidence to the contrary, we presume the members follow such instructions. *Sewell*, 76 M.J. at 19. However, the power of standard curative instructions to "unring" the bell of objectionable argument or other trial errors is not unlimited. *United States v. Diaz*, 59 M.J. 79, 93 (C.A.A.F. 2003); *United States v. Armstrong*, 53 M.J. 76, 82 (C.A.A.F. 2000). There are times when more concerted, even aggressive, use of judicial discretion is necessary to "exercise reasonable control over the proceedings to promote the purposes of [the Rules for Courts-Martial] and [the Manual for Courts-Martial]." R.C.M. 801(a)(3).

After a thorough review of the record, we conclude that "the military judge's instructions did not provide the panel members with 'a sufficient sense of judicial disapproval of both content and circumstance needed to dispel the harm in the core of [trial counsel's improper arguments]." *Sewell*, 76 M.J. at 21 (Ohlson, J., concurring in part and dissenting in part) (quoting *United States v. Simtob*, 901 F.2d 799, 806 (9th Cir. 1990)). The military

---

[43] And when the Defense objected, the trial counsel's initial response was to ask, in front of the members, "It's defense counsel's position that it [pretrial confinement] has not stopped him [Appellant] from doing that [committing more sexual assaults and rapes]?" R. at 1706. Such jocularity is the sort of gamesmanship that military judges must assiduously guard against, lest criminal trials devolve into mere popularity contests between attorneys that "detract[] from dignity and solemn purpose of the court-martial proceedings." *Fletcher*, 62 M.J. at 182. The trial counsel's remark drew no special rebuke here, although the underlying improper argument eventually resulted in a curative instruction.

judge correctly sustained the Defense's objections and then addressed the issues in some fashion with the members, including instructing them on four occasions to disregard the trial counsel's argument. But as our superior court has reminded us, "[t]he judge is not a mere figurehead or simply an umpire in a contest between the Government and accused." *United States v. Watt*, 50 M.J. 102, 105 (C.A.A.F. 1999) (citation and internal quotations omitted). By the time the trial had reached the sentencing phase, the Government had already drawn a variety of sustained objections for, among other things, arguing facts not in evidence during its summation (including some of the same facts the trial counsel then sought to re-argue in sentencing) and making disparaging remarks about CDC's representation of Appellant. In light of the volume and weight of impermissible comments, as the Government's sentencing argument progressed, it became necessary for the military judge to take more aggressive measures in exercising his "sua sponte duty to insure that [the] accused receive[d] a fair trial," *Watt*, 50 M.J. at 105 (citation and internal quotations omitted), whether by calling a recess to address and stop the recurrent errors in an R.C.M. 802 conference, taking steps to engage more senior prosecutorial leadership in the court-martial, or even at some point simply declaring enough is enough and cutting off all further argument. We recognize that if and when to take such proactive action is one of the most difficult decisions a trial judge faces, and that the decision must be made in real time, without the benefit of appellate hindsight. Nevertheless, when a military judge finds himself sustaining objection after objection for prosecutorial misconduct, it is incumbent upon the judge to ensure that the measures next taken effectively halt, if not cure, the accruing prejudice.

Here, Appellant was facing a maximum sentence of life without the possibility of parole for egregious sexual offenses against three victims, each of whom had provided victim impact statements about the harm he had caused them; the members had already improperly heard what maximum sentence could be imposed for the offense against each victim; the Defense counsel had been improperly assailed for "embarrass[ing], humiliat[ing], and slut-sham[ing]" one of those victims because he cross-examined her regarding an inconsistent statement given to a sexual assault nurse examiner about her recent sexual activity; and then the trial counsel, amidst a string of other improper comments, suggested that part of the reason Appellant should be "dealt with harshly" was because he had "forced" the victims to undergo the ordeal of testifying at trial. By this point in the trial as a whole, the cumulative impact of these erroneous comments surpassed the reach of standard curative instructions, such that we can no longer presume the panel followed them in arriving at a 25-year sentence.

While we find that the final *Fletcher* factor—the weight of the Government's evidence—is dispositive in favor of the Government for purposes of findings in this case, we cannot reach the same conclusion on the issue of prejudice that developed during sentencing. However strongly the evidence may have supported Appellant's guilt of the offenses of which he was convicted—which were undoubtedly egregious, particularly when considered collectively (as is permitted during sentencing)—it is far less clear that the members sentenced Appellant to 25 years' confinement on the basis of the evidence alone, unconnected in any way to the Government's improper arguments, particularly when viewed in the context of this entire court-martial. And while the sentence on its face is not inappropriately severe per se, that is a different question than the one we are required to answer here: "whether trial counsel's comments, taken as whole, were so damaging that we cannot be confident that [Appellant] was sentenced [in this case, by the *members*] on the basis of the evidence alone." *Halpin,* 71 M.J. at 480.

Additionally, trial counsel's statement toward the end of his sentencing argument—that the victims had not testified in the court-martial by any choice of their own, but were "forced" to do so by Appellant—may have been an implicit, if not direct, comment upon Appellant's exercise of both his Sixth Amendment confrontation right and his right to trial by court-martial. As our superior court has explained,

> A servicemember is presumed innocent and has the right to plead not guilty to the criminal charges against him or her. Accordingly, a sentencing argument by trial counsel which comments upon an accused's exercise of his or her constitutionally protected rights is beyond the bounds of fair comment.

*United States v. Edwards*, 35 M.J. 351, 355 (C.M.A. 1992) (citations and internal quotation marks omitted). Because the Defense objected to the comment on grounds of a lack of evidence that the victims were unwilling participants subjected to compulsory process—as opposed to being impermissible commentary on Appellant's exercise of his constitutional rights—the record is unclear what the intended implication of the comment actually was. Nevertheless, our superior court has squarely held that "[i]t is black letter law that a trial counsel may not comment *directly, indirectly, or by innuendo*" on an accused's exercise of his constitutional rights. *United States v. Mobley*, 31 M.J. 273, 279 (C.M.A. 1990) (addressing improper commentary on an accused's right not to testify or call witnesses on his behalf) (emphasis added and citations omitted).

Given the broad prohibition against commenting even "indirectly, or by innuendo" on the exercise of constitutional rights, trial counsel's comment was objectionable as such even though the Defense did not object on that

basis. Whereas the trial counsel's comment may well have been referring to the Appellant's misconduct as the forcing function requiring the presence of the three victims, the risk is simply too high that the members interpreted the trial counsel's comment as an indictment of Appellant's failure to plead guilty, particularly when we are analyzing its potential for prejudice in a case involving three victims and where the same trial counsel's summation had already improperly disparaged the CDC's intent "to embarrass, humiliate, and slut-shame" one of the victims.

The military judge sustained the Defense objection and instructed the trial counsel not to argue about why the victims were in court, but he took no other action, failing even to issue (yet another) curative instruction that the members disregard that comment. In light of the sentencing argument to that point, the evidence at issue in the case, and the trial as a whole, this particularly improper comment clearly called for at least a temporary all-stop to the Government's sentencing argument and a strongly-worded, explanatory instruction to the members to disregard the comment and any implication related to the exercise of Appellant's rights, as well as a strong caution to the trial counsel to stop "crossing the line and wandering dangerously into the realm of impermissible argument." *Baer*, 53 M.J. at 237-38 (citations omitted).[44]

Hence, in the context of this three-victim, emotionally charged trial, even the mere innuendo that Appellant's exercise of constitutional rights could somehow be held against him warrants a heightened standard of review. Commenting on the exercise of such fundamental rights is no less constitutionally erroneous than is commenting on an accused's failure to testify in violation of his Fifth Amendment right against self-incrimination, which has long been found to invoke a higher, constitutional standard of review. *See Chapman v. California*, 386 U.S. 18 (1967). For such constitutional violations, "rather than the probability that the outcome would have been different, courts must be confident that there was *no reasonable possibility* that the error *might have contributed* to the [outcome]." *Tovarchavez*, 78 M.J. at 462 n.5 (quoting *Chapman*, 386 U.S. at 24) (emphasis in original).

---

[44] Based on this and other comments made during the Government's sentencing and findings arguments, it is understandable why the Defense elected to lead off its own sentencing argument by discussing Appellant's "absolute" rights to plead not guilty, to request trial by a jury of his peers, to hold the Government to its burden of proof, and not to testify. R. at 1723.

In light of the damaging and repetitive errors in the Government's sentencing argument, notwithstanding the military judge's efforts to address them as they occurred, and in the context of this case as a whole, we are simply not confident that the members adjudged a sentence including 25 years' confinement on the basis of the evidence alone. Further, given the constitutional dimension of the comment that Appellant "forced" the three victims to testify at the court-martial coupled with the inadequate curative response from the military judge, we are even less confident that there was *no reasonable possibility* that this constitutional error *might have contributed* to that sentence. Accordingly, we find reversible error and take action in our decretal paragraph.

## III. CONCLUSION

The findings are **AFFIRMED.** The sentence is **SET ASIDE**. Because we cannot "determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity," *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013), the record is returned to the Judge Advocate General for remand to an appropriate convening authority with a sentencing rehearing authorized.

Chief Judge CRISFIELD and Senior Judge GASTON concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court